**KOEN BOOK DISTRIBUTORS, et al.,**

v.

**POWELL, TRACHTMAN, LOGAN, CARRLE, BOWMAN & LOMBARDO, P.C., et al.**

No. CIV.A.02–971.

United States District Court,
E.D. Pennsylvania.

Dec. 13, 2002.

*MEMORANDUM*

BARTLE, District Judge.

This is a legal malpractice action. Plaintiffs have filed a motion for production of thirty-one documents which the defendants Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C. and Michael J. Curry, Esquire (hereinafter collectively defendant law firm) have withheld on the ground of attorney-client privilege and/or attorney's work product.

---

The relevant facts for present purposes are as follows. Plaintiffs, wholesalers and distributors of books, retained the defendant law firm for advice concerning a security interest from one of its customers, Crown Books Corporation ("Crown"). After Crown filed for bankruptcy, the law firm continued to represent plaintiffs as creditors in the bankruptcy proceeding. Ultimately, plaintiffs became dissatisfied with the law firm's services and on July 9, 2001 informed the firm that they were considering a malpractice action against it. Nonetheless, they continued to retain the firm until August 13, 2001, when they terminated its services. During this period, plaintiffs were consulting with other counsel concerning the quality of the defendants' representation.

In the meantime, between July 9 and August 13, several lawyers in the defendant law firm who were actually doing the work for plaintiffs consulted with another lawyer in the firm concerning ethical and legal issues that had arisen out of the portent of a malpractice action. Various internal documents among the lawyers of the firm were generated during these few weeks. These are the documents which are the subject of the current motion.

This diversity action is governed by the law of Pennsylvania [1] which defines the attorney-client privilege by statute:

> In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa. Cons.Stat. Ann. § 5928.

The Court of Appeals, most recently in *Montgomery County v. Microvote Corp.*, has applied the following elements in explaining the operation of the privilege in Pennsylvania:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

175 F.3d 296, 301 (3d Cir.1999) (citing *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir.1994)).

The attorney-client privilege is the oldest of the communication privileges known to the law. Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390, 101 S.Ct. 677.

It is clear that the attorney-client privilege applies in the corporate setting when an employee seeks legal advice from in-house counsel and the other criteria outlined above are met. *Id.* at 389–90, 101 S.Ct. 677. The issue before us is whether the privilege similarly shields documents from discovery by a client when one lawyer seeks legal advice from a fellow lawyer in their law firm concerning that client which has threatened to initiate a legal malpractice action against the lawyer or the firm.

My colleague, Judge Thomas O'Neill, faced a like issue a number of years ago in *In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D.Pa.1989). That was a multidistrict litigation arising out of the collapse of the

---

**1.** Under Rule 501 of the Federal Rules of Evidence, "... in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

Sunrise Savings and Loan Association. One of the defendants was a Philadelphia law firm that had served as Sunrise's general counsel. An issue before the court was whether the firm had properly withheld from discovery on the ground of the attorney-client privilege a number of documents to and from lawyers in the same firm who had consulted with each other during the time when the firm was general counsel to Sunrise and after the Sunrise litigation against the firm had been instituted. The court explained that a law firm owes a fiduciary duty to a client and may not engage in conflicting representations absent the exceptions set forth in Rule 1.7 of the Pennsylvania Rules of Professional Conduct.[2] Otherwise, to the extent that the seeking or obtaining of legal advice by one lawyer from another lawyer inside the firm "implicates or creates a conflict of interest," the attorney-client privilege between the lawyers in the firm is vitiated.[3] *Id.* at 597.

The seminal case in this circuit seems to be *Valente v. Pepsico, Inc.,* 68 F.R.D. 361 (D.Del.1975). That was a class action by minority shareholders and by warrant holders of Wilson's Sporting Goods Co. ("Wilson") against Pepsico, Inc. ("Pepsico"), the majority stockholder of Wilson. The dispute centered on the value of the minority shares and warrants as a result of the merger of Wilson into Pepsico. Several documents which Pepsico had withheld from discovery were prepared by the general counsel of Pepsico and forwarded to its president. At the time, the general counsel also sat on the Board of Directors of Wilson. The court found that he owed a fiduciary obligation to both companies which were then separate entities and ordered the documents to be produced. The court stated:

It is a common, universally recognized exception to the attorney-client privilege, that where an attorney serves two clients having common interest and each party communicates to the attorney, the communications are not privileged in a subsequent controversy between the two .... The fiduciary obligations of an attorney are not served by his later selection of the interests of one client over another.

*Id.* at 368 (citations omitted).

Thus, we must determine whether the defendant law firm engaged in a conflict of interest, that is, representation adversely implicating or affecting the interests of the plaintiffs, when it was receiving information from and/or providing legal advice to several of its lawyers while at the same time continuing to represent those plaintiffs. As *Sunrise* made clear, the decision must be made on a case-by-case basis. *See Sunrise,* 130 F.R.D. at 597 n. 11. This is consistent with the approach of the Supreme Court to privilege issues. *See Upjohn,* 449 U.S. at 396, 101 S.Ct. 677. We note that no one argues that the exceptions in Rule 1.7 of the Pennsylvania Rules of Professional Conduct apply here.

Defendants also rely on the attorney work-product doctrine to avoid production of most of the documents before us. The doctrine was originally formulated by the Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) and reaffirmed in *United States v. Nobles,* 422 U.S. 225, 236–40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *Nobles,* 422 U.S. at 238, 95 S.Ct. 2160. The material in question must at least have

**2.** Rule 1.7 provides:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after full disclosure and consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

**3.** The court in *Sunrise* referred the review of most of the documents in issue to a Special Master.

been prepared "in anticipation of litigation." *In re Ford Motor Co.,* 110 F.3d 954, 968 (3d Cir.1997). Like the attorney-client privilege, protection afforded by the work-product doctrine is not absolute. Clearly, lawyers cannot cloak themselves in its mantle when their "mental impressions and opinions are directly at issue." *See Sunrise,* 130 F.R.D. at 566. The doctrine does not apply where a client, as opposed to some other party, seeks discovery of the lawyer's mental impressions. *Spivey v. Zant,* 683 F.2d 881, 885 (5th Cir.1982). It cannot shield a lawyer's papers from discovery in a conflict of interest context anymore than can the attorney-client privilege.

To avoid discovery, the law firm relies heavily on the fact that from July 9 to August 13 the plaintiffs had consulted with and engaged other outside counsel to represent them. We do not think this makes any difference. Simply because plaintiffs may have retained other counsel does not remove the conflict so long as defendants also continued to represent them. It is the relationship between the clients and the law firm from which discovery is sought that is central to the analysis.

The firm argues that it was in an impossible position between July 9 and August 13 and should not have to forego the benefit of the attorney-client privilege or the work-product doctrine during this period. We recognize that the firm was enmeshed in an unenviable situation once the threat had been made with a hearing before the bankruptcy judge scheduled for July 23, only two weeks away. Nonetheless, the firm still owed a fiduciary duty to plaintiffs while they remained clients. This duty is paramount to its own interests. To avoid or minimize the predicament in which it found itself, the firm could have promptly sought to withdraw as counsel in the bankruptcy proceeding. Alternatively, if it reasonably believed that representation of the clients would not be adversely affected by also representing itself, it could have promptly solicited the clients' consent to continue the representation "after full

disclosure and consultation." *See* Rule 1.7(b). Neither course was pursued.[4]

We have reviewed in camera each of the thirty-one documents in issue. Initially, there are two that do not appear to be subject to the attorney-client privilege or the attorney work-product doctrine regardless of the conflict issue. One is a two word message on August 8, 2001 at 6:09 a.m. from Michael Curry, Esquire to Michael G. Trachtman, Esquire. The other is an e-mail, also consisting of only two words, from Mr. Curry to Mr. Trachtman on August 13. It merely forwards without identification a written communication from the plaintiffs' principals terminating the firm's services.

█ The remaining twenty-nine documents, all written after the threat of the malpractice action, would clearly have been protected from discovery by the attorney-client privilege or the work-product doctrine if a third party, for instance Crown, had sought access to them. We must therefore undertake the conflict analysis. These documents, with one exception, are e-mails from one lawyer to another in the firm concerning if and how to continue to represent the clients and how to respond to the clients' communications. Permeating the documents is consideration of how best to position the firm in light of a possible malpractice action. They clearly establish that the law firm was in a conflict of interest relationship with its clients.

The remaining document is a July 11, 2001 memo to the file by Paul Logan, Esquire of the defendant law firm. The redacted portion sets forth a chronology of certain events relevant to plaintiffs' claim against Crown. While it appears to be work-product, the law firm cannot prevent its then clients from having access to it. *See Spivey,* 683 F.2d at 885; *Sunrise,* 130 F.R.D. at 566–67.

The defendant law firm has not met its burden of proof on the issues of the attorney-client privilege or attorney work-product doctrine. *See In re Grand Jury Investigation,* 599 F.2d 1224, 1233 (3d Cir.1979). Accord-

4. Whether other avenues were open to defendant so as to avoid later discovery of internal docu- ments we need not determine here.

ingly, all of the documents which are the subject of the pending motion are discoverable and must be produced.