# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Garvy v. Seyfarth Shaw LLP*, 2012 IL App (1st) 110115

---

| | |
|---|---|
| Appellate Court Caption | PETER GARVY, Plaintiff-Appellee, v. SEYFARTH SHAW LLP, Defendant-Appellant (Edward J. Karlin, Defendant; Lowis and Gellen LLP, Third-Party Defendant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-0115 |
| Filed | March 1, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a legal malpractice action arising from defendant's representation of plaintiff in chancery litigation, the trial court's orders requiring defendant to produce documents and communications between defendant's in-house and outside counsel related to plaintiff's malpractice action were reversed where it was not shown that plaintiff could not obtain similar information from other sources. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-4924; the Hon. Daniel J. Pierce, Judge, presiding. |
| Judgment | Reversed in part and vacated in part; cause remanded. |

Counsel on
Appeal

Jenner & Block LLP, of Chicago (Jeffrey D. Colman, John R. Storino, and Justin A. Houppert, of counsel), for appellant.

Flaherty & Youngerman, P.C., of Chicago (Michael J. Flaherty and C. Corey S. Berman, of counsel), for appellee.

Illinois State Bar Association, of Springfield (Mark D. Hassakis and Charles J. Northrup, of counsel), Chicago Bar Association (J. Timothy Eaton and Dan L. Boho, of counsel), and Mayer Brown LLP, both of Chicago (James D. Holzhauer, of counsel), for *amici curiae*.

Panel

JUSTICE STERBA delivered the judgment of the court, with opinion.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff-appellee Peter Garvy sued defendant-appellant Seyfarth Shaw LLP (Seyfarth) and defendant Edward J. Karlin for legal malpractice, fraud, and breach of fiduciary duty. During the discovery phase of the proceedings, Seyfarth objected to Garvy's requests to produce communications between Seyfarth attorneys and both in-house and outside counsel related to Garvy's claims against Seyfarth, on the grounds that the communications were protected by attorney-client privilege or the work-product doctrine. In response to Garvy's motion to compel, the circuit court ruled that communications related to Garvy's claims against Seyfarth were not privileged as to Garvy during the period of time that he was represented by Seyfarth and ordered Seyfarth to produce certain documents and communications. Seyfarth subsequently informed the circuit court that it would not comply with the order to the extent that it involved attorney-client communications or work product, and the circuit court ordered Seyfarth held in contempt and entered a $100 fine against it. On appeal, Seyfarth first contends that the circuit court's discovery and contempt orders are void because the circuit court improperly denied Karlin's motion for substitution of judge as of right pursuant to section 2-1001(a)(2) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-1001(a)(2) (West 2008)). Seyfarth further contends that the documents and communications in question are protected by the attorney-client privilege and work-product doctrine and that Garvy waived any conflict of interest that could potentially pierce those privileges. For the following reasons, we reverse the order of the circuit court and remand for further proceedings.

-2-

¶ 2                                        BACKGROUND

¶ 3         In 2001, Garvy retained Seyfarth to provide corporate advice related to the management of the Garvy Holding Company (GHC), which was privately owned by Garvy, his father, Eugene Garvy (Gene) and his four siblings, Maria Garvy, Joseph Garvy, Elizabeth Garvy and Anthony Garvy (Siblings). Garvy and the Siblings each owned 20% of the common shares and 6,000 preferred shares in GHC and Gene owned 8,950 preferred shares in GHC. At that time, the GHC board of directors (Board) consisted of three people: Garvy, Gene and Garvy's mother, Adeline Garvy. GHC is the holding company for all issued and outstanding shares of Vegetable Juices, Inc. (VJI).

¶ 4         Garvy and Gene were in agreement on issues related to the management of GHC and sought legal advice from Seyfarth regarding how to keep the Siblings from interfering with their management decisions. Seyfarth advised Garvy to issue 11,000 preferred shares to certain key management personnel in lieu of compensation bonuses, and allegedly further advised him not to put the issuance of the shares before the GHC shareholders for discussion, ratification or approval. Seyfarth also advised Garvy to increase the size of the GHC Board from three to seven members. In addition to the original Board members, the new Board would consist of two of the Siblings and two people who held management positions in GHC and whose votes were controlled by Garvy. The Board voted to issue 11,000 preferred shares and informed the Siblings of the issuance at the GHC shareholders' meeting. The Board was also increased to seven members.

¶ 5         The Siblings objected to the issuance of the 11,000 shares and demanded that they be rescinded. On Seyfarth's advice, Garvy entered into settlement negotiations with the Siblings through Seyfarth. The negotiations involved the terms of two settlement agreements between Garvy and the Siblings, an employment agreement and a shareholders' agreement. The terms of the agreements provided, *inter alia*, that the Board would be reduced to five members, comprised of Garvy and the Siblings, and that the 11,000 preferred shares would be rescinded.

¶ 6         Prior to the execution of the agreements, Garvy sought advice from Seyfarth regarding his intention to purchase 8,500 of Gene's preferred shares. The intended purchase would mean that Garvy would then own 14,500 preferred shares which, together with his common shares, would give him minority control of the Board and the ability to prevent any transaction that would require a two-thirds majority vote. Seyfarth allegedly advised Garvy to delay the purchase of the preferred shares until after the agreements had been signed by all parties. Seyfarth allegedly further advised Garvy not to disclose his intended purchase to the Siblings.

¶ 7         The employment agreement and shareholders' agreement were both executed on July 31, 2002. On August 13, 2002, Gene sold 8,500 preferred shares to Garvy for $10 per share. Because the purchase of the shares gave Garvy voting rights and a minority control interest, the actual value of the shares exceeded $3.5 million. When the Siblings learned of the purchase, they threatened to void the shareholders' agreement. In the meantime, Adeline, who had commenced divorce proceedings, accused Gene of dissipating marital assets by selling the shares to Garvy. She subsequently filed a fraudulent conveyance claim against

Garvy and Gene. Garvy retained Seyfarth to represent him in the fraudulent conveyance litigation.

¶ 8    In August 2004, the Siblings voted to terminate Garvy as president and chief executive officer of GHC and as president of VJI, in part because of his failure to disclose the intended purchase of the 8,500 preferred shares. The Siblings also filed a lawsuit against Garvy and Gene in the circuit court of Cook County (the chancery litigation). The complaint in the chancery litigation alleged that the issuance of the 11,000 preferred shares was unlawful because it violated the preemptive rights of the existing shareholders. The complaint further alleged that the 8,500 preferred shares transferred from Gene to Garvy were undervalued and that the failure to disclose the transfer constituted a breach of fiduciary duty. Garvy asked Seyfarth to represent him in the chancery litigation.

¶ 9    At the direction of its in-house counsel, Peter Woodford, Seyfarth sent Garvy and Gene a letter dated November 3, 2004, regarding the potential conflicts of interest in Seyfarth's representation of either or both of them in the chancery litigation. In the letter, Seyfarth noted that the complaint in the chancery litigation alleged that Garvy and Gene engaged Seyfarth to advise them on how they could "obtain control over GHC and VJI," and Seyfarth advised them on the issuance of the preferred shares. The letter confirmed that, according to Seyfarth's billing records, it did indeed provide advice concerning the composition of the GHC Board, as well as on the issuance of the preferred shares. Seyfarth stated that it would likely be treated as counsel to GHC, rather than to Garvy and Gene personally, and would most likely have to produce its files regarding the representation. Moreover, Seyfarth stated that it was likely that the plaintiffs would seek to add Seyfarth as a defendant and assert a malpractice claim regarding the issuance of shares without recognizing the shareholders' preemptive rights, or claim that Seyfarth aided and abetted an illegal scheme perpetrated by Garvy and Gene.

¶ 10    The letter also discussed allegations in the complaint related to the 8,500 preferred shares that were transferred from Gene to Garvy after the employment and shareholders' agreements were executed. The letter noted that the complaint alleged that the transfer was the result of advice rendered by Seyfarth for the purpose of assisting Garvy and Gene in retaining control of GHC. The complaint further alleged that the failure to disclose the transfer constituted a breach of fiduciary duty which invalidated the shareholders' agreement. Seyfarth explained that the subject of whether the agreement should be invalidated was a very complicated legal question. In addition to the conflicts presented by the allegations as discussed in the letter, Seyfarth noted that it was also representing Garvy in the fraudulent conveyance litigation and had worked closely with Gene's separate attorney in the divorce proceeding.

¶ 11    The letter went on to explain that because Garvy's and Gene's interests could diverge as a result of the various proceedings against both of them, Seyfarth advised them to consider and decide between themselves, with the advice of independent counsel, whether they wanted Seyfarth to represent both of them in the chancery litigation. Finally, Seyfarth explained that because its prior advice would be an issue in the chancery litigation, there was the potential that Seyfarth could be seen as taking positions to favor its own interests over the interests of Garvy and Gene. The fact that Seyfarth attorneys could be witnesses could also adversely affect its ability and effectiveness in representing either of them. The letter

-4-

discussed various ways in which the issues could develop during the course of the litigation and disclosed what Seyfarth intended to argue with respect to the different counts in the alternative scenarios. Finally, the letter stated: "Because plaintiffs have made so many allegations relating to the role of Seyfarth Shaw in this matter, we *strongly* encourage you to seek independent counsel regarding the import of this consent and your rights in this matter." (Emphasis in original.) The letter concluded with the following:

> "If, after reviewing the issues and conflicts described above with separate counsel, you wish Seyfarth Shaw to continue to represent you in this lawsuit, please sign this letter below as your acknowledgement [*sic*] of the potential conflicts of interest between yourselves, and yourselves and Seyfarth Shaw, and as your consent to Seyfarth Shaw's representation of you in light of this discussion of the conflicts and potential developments as the lawsuit proceeds.

> We emphasize that you remain completely free to engage independent counsel at any time even if you do decide to sign the consent set forth below, and we will cooperate fully with independent counsel's review of the matter."

¶ 12 There is no evidence in the record that Garvy ever signed the letter. Shortly after his receipt of the letter, Garvy retained Allan Horwich of Schiff Hardin as independent counsel to address the issues raised in the letter. Horwich asserted legal malpractice claims against Seyfarth on behalf of Garvy and entered into precomplaint settlement discussions with Woodford. On December 23, 2004, Horwich sent Woodford a letter regarding the settlement negotiations and stated that it was his understanding that Garvy would like to continue to proceed with representation by Seyfarth in the chancery litigation. On February 16, 2005, Horwich requested that Seyfarth enter into a tolling agreement regarding Garvy's claims against Seyfarth. Seyfarth entered into the tolling agreement and settlement discussions continued on the malpractice claims. On February 24, 2005, in a communication to follow up on the tolling agreement, Horwich stated, "I understand that [Garvy] is satisfied with the way the [chancery] litigation has been handled to this point and wishes to proceed with Seyfarth and, as well, that Seyfarth is prepared to proceed."

¶ 13 In June 2006, Seyfarth retained Jenner & Block (Jenner) to represent Seyfarth with regard to Garvy's malpractice claims. On September 27, 2006, Jenner sent Horwich a letter regarding the settlement of Garvy's claims. Jenner requested a resolution of Garvy's claims in the near future, independent of the chancery litigation. Jenner further stated that its strong recommendation to Seyfarth was that the existing arrangement where Seyfarth continued to represent Garvy in the chancery litigation while Garvy had pending malpractice claims against Seyfarth could not continue much longer. On November 9, 2006, Jenner sent another letter to Horwich, confirming that during a prior telephone conversation, Horwich had offered to waive any conflict of interest between Garvy and Seyfarth with respect to settlement discussions in the chancery litigation. The letter stated that based on that offer and on Garvy's actions, it was Jenner's understanding that Garvy consented to Seyfarth handling the settlement discussions in the chancery litigation. However, the letter went on to state that if the chancery litigation did not settle "during the standstill period or a reasonable extension thereof," Seyfarth would withdraw from the litigation. On November 16, 2006, Horwich sent a letter to Jenner stating that Garvy's position with respect to Seyfarth withdrawing from the

chancery litigation was that such a withdrawal would be an unwarranted change in position and inconsistent with the assurances given to Garvy by Seyfarth. On March 1, 2007, Schiff Hardin sent a letter to Jenner regarding Seyfarth's commitment and responsibility as Garvy's counsel. The letter noted that after first warning that Seyfarth would withdraw if settlement did not appear likely, Jenner had subsequently announced that Seyfarth would withdraw regardless of the impact on the chancery litigation settlement. The letter stated that Garvy had consistently objected that withdrawal would not only be contrary to prior commitments but could sabotage settlement prospects. On May 2, 2007, after settlement discussions in the chancery litigation terminated unsuccessfully, Seyfarth withdrew as Garvy's counsel.

¶ 14    On May 11, 2007, Garvy filed a complaint against Seyfarth and Karlin, alleging legal malpractice, fraud and breach of fiduciary duty. After several dismissals without prejudice, Garvy filed a fourth amended complaint. The circuit court denied Seyfarth's motion to dismiss on 9 of the 10 counts in the complaint. The case was then transferred to another judge and Seyfarth and Karlin filed a motion to reconsider the ruling on the motion to dismiss. On February 3, 2010, the circuit court continued the motion for reconsideration and stated that the parties should proceed with discovery. The court further stated that the likelihood of a reversal on the previous ruling was "slim to none." On February 19, 2010, Karlin filed a motion for substitution of judge. The circuit court denied the motion, stating that it probably said more than it should have when ruling on the previous motion, but that, at the February 3 hearing, "the defendant not only has tested the water but found the water to be not of its liking."

¶ 15    During the discovery process, Garvy sought the production of Seyfarth's internal and external communications related to its representation of Garvy, including all information related to Garvy's legal malpractice claims. On September 10, 2010, Garvy filed a motion to compel Seyfarth to produce all internal and external communications and work product regarding Garvy that were authored or received during the time period that Seyfarth represented Garvy, and to compel Jenner to produce any work product and all communications with Seyfarth regarding Garvy that were authored or received during that same time period. In the alternative, Garvy sought to compel Seyfarth and Jenner to produce privilege logs for all documents withheld upon a claim of privilege. Garvy further requested an *in camera* review of the documents listed in the privilege logs for which Seyfarth or Jenner asserted any common law privilege.

¶ 16    At the hearing on the motion to compel on November 3, 2010, the circuit court asked why Garvy was not entitled to information that could support his claim that the firm was acting on its own behalf and not his. Counsel for Seyfarth responded that Garvy was fully advised of the potential conflicts of interest in the November 3, 2004, letter. The circuit court raised the possibility that the disclosure in the letter may not have been complete, and stated that it was similar to asking a student to grade his own paper. Counsel responded that the letter advised Garvy to seek independent counsel, which he did, and that he then waived the conflicts. The circuit court ordered Seyfarth to produce all internal communications with Woodford until the date of Seyfarth's withdrawal as Garvy's counsel, with the exception of communications related to requests for ethics advice. However, the court ruled that Woodford's ultimate conclusions regarding ethics issues were subject to disclosure. The

court further ordered Seyfarth to produce a privilege log identifying all documents involving ethics advice and tender the log to the court for an *in camera* inspection. Finally, the court ordered Seyfarth to produce a privilege log identifying all documents and communications pertaining to Seyfarth's representation of Garvy with persons outside Seyfarth prior to Seyfarth's withdrawal and tender the log to the court for an *in camera* inspection. A written order was issued on November 18, 2010. The order stated that the transcript from the November 3, 2010, hearing controlled to the extent that the written order was silent or inconsistent with the court's oral rulings.

¶ 17 Seyfarth filed a motion to reconsider and, in the alternative, asked the circuit court to certify the issue for appeal. At a hearing on November 22, 2010, the circuit court denied the motion to reconsider. The circuit court stated that there had been a very simple solution, namely, that Seyfarth should have simply withdrawn despite Garvy's objection. The court also denied the request for certification, stating that it would only cause further delay. The court then stated that if Seyfarth intended to appeal by way of the contempt process, it believed that its November 18 order should be modified to order Seyfarth to produce all communications between Seyfarth and Jenner up to the point of Seyfarth's withdrawal. The circuit court did not conduct an *in camera* inspection of the ethics advice privilege log, but instead ordered Seyfarth to tender it to Garvy. Seyfarth tendered the log in open court. Seyfarth also presented an additional privilege log it had prepared of all communications with in-house counsel related to its representation of Garvy prior to May 2, 2007. The court did not inspect this log either, but instead ordered Seyfarth to tender it to Garvy, and Seyfarth did so in open court. Seyfarth stated that it had not yet been able to complete the privilege log of communications between Seyfarth and Jenner due to the volume of documents involved and the court ordered Seyfarth to tender that log at the next hearing, to the extent reasonably possible.

¶ 18 On December 9, 2010, Seyfarth tendered the privilege log of communications with persons outside Seyfarth regarding Garvy's claims against Seyfarth prior to Seyfarth's withdrawal on May 2, 2007. The circuit court did not review the log, but ordered Seyfarth to tender it to Garvy. Seyfarth tendered the log in open court. The circuit court also reviewed the changes to the written order of November 22, 2010, ordering Seyfarth to produce the actual documents and communications with outside persons rather than simply producing a privilege log, and signed the amended order. The circuit court also clarified that its ruling was that the attorney-client privilege did not apply to the documents and communications in question. Seyfarth then informed the court that it would not comply with the circuit court's orders to produce documents or communications regarding Seyfarth's representation of Garvy with either in-house or outside counsel. Seyfarth's counsel asked the circuit court to hold him personally in civil contempt for purposes of appeal. The circuit court instead held Seyfarth in civil contempt and entered a $100 fine against it. Seyfarth timely filed this appeal. On June 6, 2011, this court granted a motion for leave to file an *amici curiae* brief on behalf of the Illinois State Bar Association and the Chicago Bar Association.

ANALYSIS

¶ 20    As an initial matter, we must address two motions that this court ordered to be taken with the case. Seyfarth's first contention on appeal is that the circuit court's discovery and contempt orders are void because the court erred in denying Karlin's motion for substitution of judge as of right pursuant to section 2-1001(a)(2) of the Code (735 ILCS 5/2-1001(a)(2) (West 2008)), in an order entered on March 15, 2010. On January 28, 2011, Garvy filed a motion to strike and dismiss the appeal of the March 15 order, and on February 8, 2011, this court ordered that the motion be taken with the case. Relying on *Powell v. Dean Foods Co.*, 405 Ill. App. 3d 354 (2010), and *In re Austin D.*, 358 Ill. App. 3d 794 (2005), Seyfarth argued in its opening brief that it had standing to challenge the denial of Karlin's substitution motion.

¶ 21    Subsequent to the filing of the briefs in this case, our supreme court decided this issue in *Powell v. Dean Foods Co.*, 2012 IL 111714. This court granted Seyfarth's motion for leave to cite *Powell* as additional authority. In its motion, Seyfarth argues that, despite the supreme court's reversal of the appellate court decisions in both *Powell* and *Austin D.*, this court still has jurisdiction to determine whether the circuit court erred in denying Karlin's substitution motion. Seyfarth contends that: (1) *Powell* is distinguishable because the codefendant there was dismissed with prejudice and therefore the supreme court did not address the remaining defendants' "entire case" argument, (2) this court will eventually need to address the issue so, in the interest of judicial efficiency, we should address it now, and (3) Karlin has an interest in the appeal and Seyfarth is asserting and protecting his rights as his employer. The second and third arguments clearly have no merit. This court does not have the authority to decide an issue over which it has no jurisdiction simply because it would be more efficient to do it now rather than later. Also, because the outcome of the litigation is not yet known, it cannot be said that this court will eventually need to address the substitution issue. Moreover, the mere fact that Karlin is an employee of Seyfarth with an interest in the litigation does not give Seyfarth standing to assert and protect his rights when Karlin is also a separately named defendant in the litigation. Therefore, we must determine whether, in light of *Powell*, Seyfarth has standing to appeal the denial of its codefendant's substitution motion.

¶ 22    The supreme court held that the defendants in *Powell* did not have standing to challenge an order denying a codefendant's substitution motion. *Id.* ¶ 42. The court reasoned that none of the defendants could claim that they had been prejudiced by the denial because each party could have separately sought a substitution of judge. *Id.* ¶¶ 39-42. In fact, of the three remaining defendants who were parties to the appeal, two had previously sought and obtained a substitution of judge, and the court concluded that the third defendant was not prejudiced because he could have filed a motion for substitution of right or for cause but elected not to do so. *Id.* ¶¶ 40-41. In the case *sub judice*, Seyfarth could have filed its own motion for substitution of right and, thus, it has no standing to appeal the circuit court's denial of its codefendant's substitution motion.

¶ 23    Seyfarth's attempt to distinguish *Powell* is unavailing. The defendants in *Powell* argued that because the appellate court held that their codefendant's substitution motion should have been granted, which would have entitled the codefendant to a new trial before a different

judge, all defendants who were parties to the "entire case" were entitled to a new trial. *Id.* ¶ 45. The supreme court declined to address this argument because the codefendant had been dismissed from the case. *Id.* ¶ 46. Given that dismissal, the court stated that there was no need to remand the case for a new trial before a different judge. *Id.* The supreme court went on to vacate the appellate court's order because the remaining defendants in the case lacked standing to challenge the order. *Id.* ¶ 47. Seyfarth argues that because Karlin has not been dismissed from the case and has a real interest in the matter, this language supports its position that this court has jurisdiction to determine whether the circuit court erred in denying Karlin's substitution motion. However, such an interpretation would render the supreme court's reasoning in *Powell* feckless. The defendants in *Powell* made just such an argument to the supreme court, contending that they each had "a personal stake and a direct, immediate and substantial interest in the outcome." *Id.* ¶ 38. The supreme court rejected that argument, noting that in order to show prejudice, the defendants would have to show that they had a right to the substitution as a result of the codefendant's motion. *Id.* ¶ 42. However, the court reasoned that none of the defendants had that right, because some of the defendants had already sought and obtained a substitution of judge and the remaining defendant could have filed its own motion but chose not to do so. *Id.* Therefore, the remaining defendants had no standing to appeal the denial of the substitution motion. *Id.*

¶ 24   Seyfarth's attempt to avoid this result is ultimately another efficiency argument. Because Karlin is still a party to the litigation and can appeal the denial of his substitution motion if he is not satisfied with the final disposition of the case, Seyfarth would like us to decide this issue prior to trial. We note that unlike the situation in *Powell*, where the appellate court had already determined that the denial of the substitution motion was reversible error, no such determination has been made here. As previously noted, the fact that it might be more efficient for us to determine at this stage in the litigation whether the circuit court erred in denying the substitution motion does not give this court the authority to decide an issue over which we currently have no jurisdiction. Under our supreme court's decision in *Powell*, Seyfarth has no standing to appeal the circuit court's denial of its codefendant's substitution motion. Therefore, Garvy's motion to dismiss the appeal of the circuit court's March 15, 2010, order denying Karlin's motion for substitution of judge is granted.

¶ 25   The second motion that this court ordered to be taken with the case involves the privilege logs that Seyfarth produced and subsequently tendered to Garvy. On August 5, 2011, Garvy filed a motion to supplement the record on appeal with the three privilege logs. Seyfarth filed a response to the motion together with a motion to strike Garvy's appellate brief on the grounds that it relies extensively on three privilege logs that were never accepted, reviewed or considered by the circuit court during its consideration of the orders that are now being appealed. This court granted the motion to supplement the record on August 16, 2011, and, on August 18, 2011, ordered Garvy to file a memorandum explaining whether the circuit court considered the privilege logs. Garvy subsequently filed a memorandum and Seyfarth filed a response to the memorandum. On September 7, 2011, this court ordered that the motion to strike Garvy's responsive brief be taken with the case.

¶ 26   Illinois Supreme Court Rule 329 (eff. Jan. 1, 2006) allows the parties to supplement the record to include documents that were before the trial court but not part of the record on

appeal. However, it is well settled that matters not properly part of the record and not considered by the court in the proceedings below will not be considered on review even if they are included in the record. *People v. Joya*, 319 Ill. App. 3d 370, 380-81 (2001); *Avery v. Sabbia*, 301 Ill. App. 3d 839, 843-44 (1998). To the extent that arguments in a brief rely on documents that are not properly part of the record, the reviewing court will disregard them. *Avery*, 301 Ill. App. 3d at 844.

¶ 27    Our review of the record discloses that the circuit court never viewed the privilege logs, but ordered Seyfarth to tender them to Garvy's counsel, which Seyfarth did in open court. There is no indication in the record that the circuit court considered anything in the privilege logs in its discovery rulings. Garvy's memorandum to this court merely contains a recitation of the events in the proceedings below that led to the circuit court's order to produce various privilege logs and the actual production of those logs. The memorandum includes a quote from the circuit court in which it stated that it would review the privilege logs, but ultimately acknowledges that the circuit court never reviewed the logs. Instead, Garvy merely argues that, prior to entering its discovery orders, the circuit court was aware of the category of documents that were included in each individual log. Thus, the privilege logs are not properly part of the record on appeal. This court has not reviewed the privilege logs and has not relied on the content of the logs in any way in reaching its decision in this appeal.

¶ 28    Seyfarth asks this court to strike Garvy's entire responsive brief and grant Garvy leave to file a brief that does not contain improper citations to and arguments based on the privilege logs. However, inasmuch as this court ordered that the motion be taken with the case, we decline at this point in the appeal to strike the entire brief. In the alternative, Seyfarth asks this court to strike all matters outside the record and all arguments related to the privilege logs. We hereby order that all references to the supplemental record containing the privilege logs and all arguments made in reliance on the contents of the privilege logs themselves be stricken from the responsive appellate brief. This court has not considered any arguments made in reliance on the contents of the logs in reaching its final decision.

¶ 29    We now address Seyfarth's remaining issues on appeal. Seyfarth contends that the circuit court erred in ordering Seyfarth to produce communications with its in-house general counsel and outside counsel because: (1) the fiduciary exception to the attorney-client privilege is not recognized under Illinois law, (2) public policy considerations supporting the attorney-client privilege in general apply equally to attorneys who seek legal advice, and (3) Garvy waived any claim to a conflict that could potentially pierce the attorney-client privilege. Discovery orders are generally subject to an abuse of discretion standard of review; however, we review the circuit court's determination of whether a privilege applies *de novo*. *Mueller Industries, Inc. v. Berkman*, 399 Ill. App. 3d 456, 463 (2010).

¶ 30    The purpose of the attorney-client privilege is to encourage clients to engage in full and frank discussion with their attorneys without the fear of compelled disclosure of information. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991). However, the privilege has limits and must be narrowly construed. *Waste Management*, 144 Ill. 2d at 190. Under Illinois law, the attorney-client privilege protects "communications which the claimant either expressly made confidential or which he could reasonably believe under the

circumstances would be understood by the attorney as such." *Id*.

¶ 31 Garvy argues that the attorney-client privilege does not apply because Seyfarth continued to represent him at the time it sought legal advice and, therefore, owed him an ongoing fiduciary duty. The fiduciary-duty exception to the attorney-client privilege arose in the context of trust law and was based on the principle that the beneficiary of a trust had a right to the production of legal advice rendered to the trustee *relating to the administration of the trust*. *Mueller*, 399 Ill. App. 3d at 468. The theory behind the exception was that because the advice was obtained using the authority and funds of the trust and the beneficiary was the ultimate recipient of the benefit of the advice, the beneficiary was entitled to discover the communications between the attorney and the fiduciary. *Id*. The fiduciary-duty exception does not, however, apply to legal advice rendered concerning the personal liability of the fiduciary or in anticipation of adversarial legal proceedings against the fiduciary. *Id*. at 469.

¶ 32 In the proceedings below and on appeal, Garvy relies on cases from other jurisdictions that have applied the fiduciary-duty exception to the attorney-client privilege. In *Thelen Reid & Priest LLP v. Marland*, No. C 06-2071 VRW, 2007 WL 578989, at *1-2 (N.D. Cal. Feb. 21, 2007), a law firm represented both Marland and a separate client in relation to the same matter. A contract dispute arose between Marland and the law firm, and Marland sought the production of documents that the law firm claimed were protected under the attorney-client privilege. *Id*. at *1. The documents included communications between the law firm and the attorneys for the separate client that were related to its dispute with Marland and the litigation in the underlying matter that involved both clients. *Id*. at *4. The *Thelen* court held that because the interests of the parties were intertwined and the law firm had a fiduciary duty to Marland, the law firm was required to produce documents related to its representation of Marland that were created during the time of that representation. *Id*. at *7. The court recognized an exception for certain documents relating to consultations on the firm's ethical and legal obligations to Marland; however, it ordered the law firm to produce its conclusions with respect to those ethical issues. *Id*. at *8.

¶ 33 In *Koen Book Distributors, Inc. v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 F.R.D. 283, 284 (E.D. Penn. 2002), the client told the law firm it was considering a malpractice action against the firm. Over the next month, the client consulted with independent counsel regarding any potential claims. *Id*. During that time, the attorneys who represented the client consulted with another attorney at the firm concerning the legal and ethical issues related to the potential malpractice action. *Id*. At the end of a month's time, the client terminated the law firm's services. *Id*. The *Koen* court ordered the law firm to produce any documents related to the possible malpractice action that were generated during the time period that it still represented the client. *Id*. at 286-87. The court reasoned that during that time, the firm still owed a fiduciary duty to its client and it could have either withdrawn immediately or sought the client's consent to continue its representation " 'after full disclosure and consultation.' " *Id*. at 286.

¶ 34 Although it is not stated explicitly in either the written orders or in the transcripts of the proceedings, the circuit court appears to have relied, at least in part, on both *Thelen* and *Koen* in determining that the attorney-client privilege does not apply to the documents in question. The circuit court ordered the production of all documents and communications involving the

-11-

time period before Seyfarth withdrew as Garvy's counsel, and stated that had Seyfarth simply withdrawn immediately, the issue would have been avoided. The circuit court also made an exception for documents relating to ethics advice, but ordered that the conclusions as a result of that advice be produced. The circuit court made it clear that it did not believe Seyfarth had fully disclosed the conflict or that Garvy's consent to Seyfarth's continued representation was an informed consent. Finally, the circuit court explained:

> "The Court is of the opinion that as long as an attorney is representing a client, the attorney's paramount obligation runs to the client.
>
> Attorneys hold probably the highest fiduciary relationship that can exist between parties. And as long as an attorney is representing the client, that client is entitled to complete assurance of the compliance by the fiduciary with the fiduciary's duties and obligations.
>
> \*\*\*
>
> But the Court is inclined to agree with the plaintiff that as long as Seyfarth continued to represent Mr. Garvy, Mr. Garvy is entitled to know what was going on with his lawyer as far as his lawyer's duty of fidelity to Garvy's best interest and not their own."

Thus, it is clear to this court that the circuit court based its rulings on the fiduciary-duty exception to the attorney-client privilege.

¶ 35 However, Illinois has not adopted the fiduciary-duty exception to the attorney-client privilege. See *Mueller*, 399 Ill. App. 3d at 469. The cases relied on by Garvy and the circuit court do not persuade us to create new law in Illinois by adopting it here. Moreover, even if Illinois did recognize the fiduciary-duty exception, it would not apply to the case *sub judice*. The United States Supreme Court recently discussed the history of the fiduciary-duty exception to the attorney-client privilege in American law in *United States v. Jicarilla Apache Nation*, 564 U.S. ___, 131 S. Ct. 2313 (2011). The Court noted that the leading case on the fiduciary exception is *Riggs National Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709 (1976), in which the court outlined factors to be considered in determining the "real client" to whom the attorney-client privilege properly belongs. *Jicarilla*, 564 U.S. ___, 131 S. Ct. at 2321-22. The first factor considered by the *Riggs* court was whether there were any adversarial proceedings pending between the fiduciary and the beneficiary at the time the legal advice was sought. *Id*. at ___, 131 S. Ct. at 2322 (citing *Riggs*, 355 A.2d at 712). This factor was important because, if adversarial proceedings were pending, it would indicate that the fiduciary was seeking legal advice in a personal rather than a fiduciary capacity, and the exception would not apply. *Id*. at ___, 131 S. Ct. at 2322. This goes to the heart of the purpose behind the fiduciary-duty exception, and, to the extent the cases relied on by Garvy do not take this factor into consideration, they misapply the exception. Therefore, even if Illinois did recognize the fiduciary-duty exception, it clearly would not apply here where Seyfarth sought legal advice in connection with Garvy's legal malpractice claims against it, and not in its fiduciary capacity as Garvy's counsel in the chancery litigation.

¶ 36 Moreover, even under the case law relied upon by Garvy and the circuit court, the exception would not apply. The court in *Koen* stated that the law firm could have either withdrawn or obtained the client's consent " 'after full disclosure and consultation.' " *Koen*,

-12-

212 F.R.D. at 286. We disagree with the circuit court's conclusion that Seyfarth had not fully disclosed the conflicts and that the court could not determine whether Garvy's consent to Seyfarth's continued representation was informed. The circuit court did not accept that the letter of November 3, 2004, in which Seyfarth disclosed its conflicts of interest to Garvy and Gene, constituted full disclosure. The court said it could not be sure that the law firm had fully disclosed everything and that it was the equivalent of "the student grading the paper." Under this reasoning, the disclosure requirement is frustrated and rendered rather meaningless. The law firm must disclose any conflicts, but its disclosure will never be considered full disclosure because it is coming from the law firm. We cannot agree with this reasoning.

¶ 37 It is equally unclear what could have convinced the circuit court that Garvy's consent to Seyfarth's continued representation in spite of the conflicts was informed consent. Seyfarth strongly encouraged Garvy to seek independent counsel. Garvy sought such counsel within a week of receiving Seyfarth's letter, and, through his independent counsel, asserted legal malpractice claims against Seyfarth shortly thereafter. Throughout attempted settlement negotiations related to Garvy's legal malpractice claims, his independent counsel repeatedly assured Seyfarth that Garvy wanted Seyfarth to continue to represent him in the chancery litigation and strenuously objected to any suggestion that Seyfarth might withdraw. Indeed, Garvy insisted Seyfarth remain in the case during sensitive settlement negotiations because to do otherwise would harm Garvy's interests. It is clear from the record that the conflicts were disclosed, that Garvy sought independent legal advice, and that his consent to Seyfarth's continued representation in the chancery litigation was fully informed. Moreover, Garvy entered into a tolling agreement with Seyfarth in order to preserve his malpractice claims. Garvy cannot have it both ways. He cannot insist that Seyfarth continue to represent him in the chancery litigation while he has malpractice claims pending against Seyfarth, but then use that continued representation to insist that Seyfarth produce all documents related to legal advice sought in relation to the malpractice claims generated during that time.

¶ 38 As previously stated, not only do we decline to apply the fiduciary-duty exception to the attorney-client privilege when it is not currently the law in Illinois, but the exception would not even apply where, as here, the legal advice sought was in connection to an adversarial proceeding between the fiduciary and the client. The documents sought by Garvy are clearly protected by the attorney-client privilege as "communications which the claimant either expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such" (*Waste Management*, 144 Ill. 2d at 190). Thus, we conclude that the documents and communications related to legal advice sought by Seyfarth in connection with Garvy's legal malpractice claims against it are protected from disclosure by the attorney-client privilege.

¶ 39 Garvy attempts to avoid this result by arguing that he is not asserting a fiduciary-duty exception to the attorney-client privilege, although he specifically argued in terms of this exception in the proceedings below. Rather, he now contends that Seyfarth could not establish that it had an expectation that the communications would be confidential when they related to a current client to whom it owed a fiduciary duty, and therefore, the attorney-client privilege does not attach and there is no need to determine whether an exception to the

-13-

privilege applies. Garvy cites to *DeLuna v. Burciaga*, 223 Ill. 2d 49, 72-73 (2006), for the proposition that this is not an "unpaved area of law" in Illinois. The language cited by Garvey discusses the well-settled importance of the attorney-client relationship and the weighty obligations placed on an attorney to maintain public confidence in the system of justice. *Id*. However, this language, while it may be relevant to Garvy's underlying malpractice claims, has no relevance to the issue of whether Illinois has adopted the fiduciary-duty exception to the attorney-client privilege or whether such an exception would even apply here. Garvy's argument that the requirements of the privilege can never be satisfied because the attorney is a fiduciary is simply an attempt to avoid a discussion of the applicability of the fiduciary-duty exception by calling it something other than an exception, thereby rendering the exception itself meaningless.

¶ 40   Garvy also argues that Seyfarth could have no expectation that its communications with counsel regarding Garvy's malpractice claims would be confidential because of the disclosure requirements imposed by Rules 1.4 and 1.7 of the Illinois Rules of Professional Conduct (Ill. Rs. Prof'l Conduct Rs. 1.4, 1.7 (eff. Jan. 1, 2010)). As noted by *amici*, the very rules that Garvy relies on for this proposition recognize that "[a] lawyer's confidentiality obligations do not preclude a lawyer from securing *confidential* legal advice about the lawyer's personal responsibility to comply with these Rules" (emphasis added) (Ill. Rs. Prof'l Conduct R. 1.6(b)(4) cmt. 9 (eff. Jan. 1, 2010)), and that lawyers are permitted to make confidential reports of ethical issues to designated firm counsel (Ill. Rs. Prof'l Conduct R. 5.1 cmt. 3 (eff. Jan. 1, 2010)). Thus, we reject the proposition that Seyfarth could not have had an expectation of confidentiality based on the disclosure requirements in the rules that govern attorney conduct.

¶ 41   We further note that Garvy's argument is based on his contention that Seyfarth failed to fully disclose the conflicts as required by the rules. As previously discussed, this court has rejected that argument. Even if we had not, while a violation of the rules may have relevance to the underlying claims, it has no relevance to the issue of whether the documents in question are protected by the attorney-client privilege. Garvy's counsel also contended during oral argument that Seyfarth had not disclosed that it was seeking legal counsel in relation to Garvy's malpractice claims but was carrying on "secret" communications with counsel that were adverse to Garvy. This argument is not supported by the record. Seyfarth's in-house counsel entered into precomplaint settlement negotiations with Garvy's independent counsel as soon as he asserted his malpractice claims, and Seyfarth's outside counsel took over the negotiations approximately one year later. It was therefore evident to Garvy from the time he retained independent counsel that Seyfarth was receiving legal advice on the issue of Garvy's malpractice claims.

¶ 42   Garvy's final argument related to Seyfarth's expectation of confidentiality is specifically related to communications with in-house counsel. Garvy contends that, as a member of the firm, Seyfarth's in-house counsel represented Garvy as well, creating a situation in which the attorney-client privilege would not attach. Garvy's argument is stated in terms of "common" representation and "conflicting" representation. In *Mueller*, this court addressed the dual-representation doctrine in the context of two external clients of the law firm. *Mueller*, 399 Ill. App. 3d at 464. The *Mueller* court held that the attorney-client privilege did not apply

where one client knew that the law firm represented another client on matters related to its representation of him, and could not reasonably have expected that his communications with his attorney would be confidential. *Id*. at 465. However, the *Mueller* court limited its holding to communications related to the business, the interest the two clients had in common. *Id*. Even if we were to conclude that Seyfarth representing itself is similar to the representation of an external client, the representation did not involve a common interest with Garvy. Thus, the dual-representation doctrine is not applicable here and the attorney-client privilege applies to communications with Seyfarth's in-house counsel regarding Garvy's malpractice claims.

¶ 43        Garvy also argues in his responsive appellate brief that, even if the documents in question are not discoverable under the fiduciary-duty exception, they are discoverable under the crime fraud exception. However, as Seyfarth notes in its reply brief and its motion to strike Garvy's responsive brief, this argument has been waived. In general, issues not raised in the trial court are waived and may not be raised for the first time on appeal. *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1053 (2005). Although this court has the authority to consider an issue that has been waived (*id*.), we decline to do so here. First, to the extent that Garvy's arguments are based on the contents of the privilege logs, those arguments have been stricken from his brief. Second, in the proceedings below, Garvy's counsel specifically stated to the circuit court that he was not claiming the crime fraud exception to the attorney-client privilege. Therefore, this argument has been waived.

¶ 44        Once it has been established that the information sought is protected by the attorney-client privilege, the party seeking the information has the burden of establishing that the information is not privileged, by showing that an exception to the privilege applies. *In re Marriage of Decker*, 153 Ill. 2d 298, 321 (1992). Garvy has not shown that any exception to the privilege applies; thus, the circuit court erred in ordering the disclosure of the communications and documents from in-house and outside counsel related to Garvy's claims against Seyfarth.

¶ 45        Finally, the circuit court also ordered Seyfarth to produce documents prepared by both in-house and outside counsel that Seyfarth claimed were protected under the work-product doctrine. "The work-product doctrine provides a broader protection than the attorney-client privilege, and is designed to protect the right of an attorney to thoroughly prepare his case." *Waste Management*, 144 Ill. 2d at 196. Work product that reveals the mental impressions, opinions, or trial strategy of an attorney is only discoverable "upon a showing of impossibility of securing similar information from other sources." *Id*.

¶ 46        We have found no evidence in the record of any showing of impossibility of securing similar information from other sources, and must therefore conclude that the circuit court ordered the disclosure of the documents covered by the work-product doctrine in the absence of such a showing. On appeal, Garvy argues that the work-product doctrine does not apply when the client is seeking discovery of his own attorney's mental impressions. However, Garvy only cites to cases that are not binding on this court in support of this argument, namely *Koen*, 212 F.R.D. 283, and *Spivey v. Zant*, 683 F.2d 881 (5th Cir. 1982). To the extent that these cases would even be considered persuasive, it would only be in the context of the "real client" analysis undertaken in the fiduciary-duty exception. The mental

impressions Garvy seeks to obtain are not those related to his attorney's representation of him in the chancery litigation, but those related to the adversarial proceedings between himself and his attorney. Under Illinois law, the work-product of both in-house and outside counsel is not discoverable here where Garvy has not shown that it is impossible for him to obtain information related to his malpractice claims from similar sources. Indeed, Garvy is entitled to, and has obtained, all documents relating to Seyfarth's representation of him in the chancery litigation, out of which his malpractice claims arise. Thus, the circuit court erred in ordering the disclosure of Seyfarth's in-house and outside counsel's work product related to Garvy's legal malpractice claims.

¶ 47    For the reasons stated, we reverse the circuit court's orders directing Seyfarth to produce documents and communications between in-house and outside counsel related to Garvy's legal malpractice claims. We also vacate the circuit court's contempt order against Seyfarth (see *Cangelosi v. Capasso*, 366 Ill. App. 3d 225, 230 (2006) (noting that "[w]here a party's refusal to comply with a trial court's order constitutes a good-faith effort to secure an interpretation of the two privileges in question, it is appropriate to vacate a contempt citation on appeal")), and remand for further proceedings.

¶ 48    Reversed in part and vacated in part; cause remanded.