# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *MDA City Apartments LLC v. DLA Piper LLP (US)*, 2012 IL App (1st) 111047

---

| | |
|---|---|
| Appellate Court Caption | MDA CITY APARTMENTS LLC, Plaintiff-Appellee and Third-Party Defendant, v. DLA PIPER LLP (US), Defendant-Appellant and Third-Party Plaintiff (Village Green Companies and Kent Maynard and Associates LLC, Plaintiffs and Third-Party Defendants). |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-1047 |
| Filed | March 22, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a dispute arising from defendant law firm's representation of plaintiff in connection with the construction of an apartment building, the appellate court reversed a trial court order directing defendant to produce certain communications with its in-house and outside counsel related to motions to disqualify defendant from representing plaintiff and plaintiff's legal malpractice claims against defendant, since the information plaintiff sought was protected by the attorney-client privilege and plaintiff failed to show that any exception to the privilege applied. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-05113; the Hon. Daniel J. Pierce, Judge, presiding. |
| Judgment | Reversed in part and vacated in part; cause remanded. |

| Counsel on Appeal | Chen Nelson Roberts Ltd., of Chicago (James Roberts, John Chen, and Kristi Nelson, of counsel), for appellant. |
|---|---|
| | Meckler Bulger Tilson Marick & Pearson LLP, of Chicago (Bruce R. Meckler, Christopher E. Kentra, James G. Argionis, and Jeffrey B. Greenspan, of counsel), for appellee. |
| Panel | JUSTICE STERBA delivered the judgment of the court, with opinion. Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant-appellant DLA Piper LLP (DLA) represented plaintiff-appellee MDA City Apartments LLC (MDA) in arbitration proceedings and a declaratory judgment action against Walsh Construction Company (Walsh) arising from a contract dispute. Walsh filed motions to disqualify DLA as MDA's counsel on conflict of interest grounds in both proceedings. MDA subsequently filed a legal malpractice action against DLA. During the discovery phase of the malpractice proceedings, DLA objected to MDA's requests to produce communications between DLA attorneys and both in-house and outside counsel related to Walsh's motions to disqualify and MDA's malpractice claims against DLA, on the grounds that the communications were protected by attorney-client privilege. The circuit court granted MDA's motion to compel and ordered DLA to produce the communications in question. DLA declined to comply with the production order and was held in contempt and assessed a $100 fine. On appeal, DLA contends that the communications in question are protected by the attorney-client privilege and that the fiduciary-duty exception does not apply. For the following reasons, we reverse the order of the circuit court and remand for further proceedings.

¶ 2                                  BACKGROUND

¶ 3    In 2003, MDA acquired the building located at 185 North Wabash Avenue in Chicago with the intent of converting it into a luxury residential apartment building with two commercial retail spaces on the first floor. DLA was engaged as legal counsel to represent MDA in connection with the acquisition and financing of the property, contract negotiations with the general contractor, construction issues, and certain litigation or arbitration proceedings involving the property. MDA retained Walsh as a preconstruction consultant in 2003 and subsequently executed a contract with Walsh for the renovation of the property.

¶ 4    Disputes arose between MDA and Walsh during renovation and MDA informed DLA that Walsh had breached its contract in various ways. The alleged breaches included Walsh's

failure to adequately staff the renovation, delays in "critical path" items such as establishing elevator service and failure to notify MDA of the delays, submission of poorly documented and unreasonable change orders, refusal to provide MDA with copies of subcontractor contracts, failure to adhere to quality standards, and failure to achieve substantial completion on time. On December 6, 2005, DLA sent MDA a memo advising MDA of its options regarding the withholding of payment from Walsh. The memo advised MDA of Walsh's possible responses to withholding payment, and noted that Walsh's likely response would be to record mechanics' liens on the property and also allow subcontractors to record such liens. On December 20, 2005, DLA sent Walsh a letter on behalf of MDA, advising Walsh that MDA was exercising its contractual right to withhold payment. On December 21, 2005, Walsh recorded a mechanic's lien on the property in the amount of $6.5 million. The lien was subsequently increased to $9 million.

¶ 5        Following additional correspondence between DLA and Walsh in an attempt to resolve the dispute, DLA advised Walsh on March 14, 2006, that MDA was terminating its contract with Walsh. On March 23, 2006, DLA sent MDA an e-mail in which DLA recommended filing a complaint for declaratory judgment against Walsh and an arbitration demand, preferably simultaneously. On March 28, 2006, Walsh initiated arbitration claims against MDA, seeking damages from MDA in excess of $9.5 million. On behalf of MDA, DLA filed a complaint for declaratory judgment against Walsh in the circuit court of Cook County (chancery action) on April 28, 2006.

¶ 6        DLA advised MDA in a letter dated June 6, 2006, that it had received courtesy notice from Walsh's counsel of Walsh's intent to file a motion to disqualify DLA as MDA's counsel. The letter informed MDA that DLA suspected the basis for the motion would be the fact that Walsh Construction is affiliated through a purported common ownership with Walsh Investors, for whom DLA had done work. The letter further stated that although DLA had represented Walsh Investors in other transactions, neither Walsh Construction nor Walsh Investors had ever claimed a conflict of interest in matters in which DLA was adverse to Walsh Construction. The letter speculated that it was only after DLA filed the chancery action that Walsh made the tactical decision to raise the conflict of interest issue. The letter stated that DLA would vigorously defend the motion to disqualify, and, given that the basis for the motion was an alleged conflict involving DLA, would not charge MDA any legal fees incurred in connection with arguing the motion.

¶ 7        Walsh filed a motion to disqualify DLA as counsel in the chancery action on June 15, 2006, and filed a similar motion in the arbitration proceedings. In addition to consulting with its in-house counsel, William Campbell, regarding the motions to disqualify, DLA hired the law firm of Quinlan & Carroll Ltd. (Quinlan) in July 2006 to represent DLA on those motions. Walsh also filed a motion to dismiss, or in the alternative, to stay the proceedings in the chancery action. On September 19, 2006, the circuit court granted the motion to stay, deferring a ruling on the substantive issues in the chancery action until completion of the arbitration proceedings. On October 16, 2006, DLA filed an arbitration demand against Walsh, seeking $20 million in damages. A preliminary arbitration hearing was held on January 2, 2007, and a scheduling order was entered on January 12, 2007, setting the commencement of arbitration hearings for October 1, 2007.

¶ 8    In the meantime, following discovery and briefing on the motion to disqualify in the chancery action, the circuit court heard arguments on the motion on July 18, 2007. On August 6, 2007, the circuit court granted the motion to disqualify DLA from representing MDA in the chancery action. The circuit court found that because DLA represented Matt Walsh and Dan Walsh, the owners of Walsh Construction, DLA previously represented Walsh. The circuit court further found that because of its representation of the Walsh brothers, DLA had confidential information relating to the litigation strategies of Walsh that would impact its ability to negotiate a settlement between Walsh and MDA. On August 14, 2007, the arbitration panel granted Walsh's motion to disqualify in the arbitration proceedings. MDA retained the law firm of Sonnenschein Nath & Rosenthal LLP on August 24, 2007, as substitute counsel for DLA.

¶ 9    On May 8, 2008, MDA filed a legal malpractice action against DLA. MDA's second amended complaint was filed on October 22, 2009. It included counts for legal malpractice, fraudulent concealment, and an accounting and forfeiture of attorney fees. MDA alleged that DLA committed legal malpractice by providing negligent advice on the construction contract with Walsh and on Walsh's performance as general contractor, by failing to disclose conflicts of interest, and by failing to adequately prepare for the arbitration. In its answer to the second amended complaint, DLA admitted that it did not advise MDA of its representations of other entities owned by the Walsh brothers. DLA stated that it did not believe it had any potential or actual conflicts of interest because its representation of other Walsh-owned entities was not related to MDA's renovation of the property. In its answer, DLA also stated as an affirmative defense that MDA informed DLA that MDA had retained the law firm of Kent Maynard & Associates to represent MDA in the arbitration proceedings and the chancery action, and also informed DLA that its role in those proceedings would be limited.

¶ 10    During discovery, DLA produced its conflicts resolution file. MDA also deposed a member of DLA's conflicts department. In addition, DLA produced a privilege log delineating 57 e-mail communications between DLA attorneys and Campbell from May 2006 through July 2009, and between DLA attorneys and Quinlan from September 2006 through August 2007. DLA subsequently produced two of the documents listed on the privilege log. MDA filed a motion to compel DLA to produce the remaining 55 communications. MDA argued that the documents were not protected by the attorney-client privilege because of the fiduciary-duty exception to that privilege. DLA attached Campbell's affidavit to its motion in opposition. Campbell stated that his primary responsibility was to act as in-house counsel to DLA and that he no longer actively represented clients of the firm. He stated that his communications with attorneys at DLA related to the motion to disqualify, the ruling on the motion to disqualify, and the threatened litigation by MDA.

¶ 11    At a hearing on the motion to compel on March 10, 2011, the circuit court stated that as long as an attorney represents a client, the client is entitled to communications the attorney has with in-house and outside counsel related to issues involving the client. On March 14, 2011, the circuit court entered an order granting the motion to compel DLA to produce the 55 documents for the reasons stated in open court, holding DLA in civil contempt for its refusal to comply, and assessing a sanction of $100 against DLA. DLA timely filed this appeal.

¶ 12                                    ANALYSIS

¶ 13       DLA contends that the circuit court erred in ordering the production of communications with in-house and outside counsel because the communications are protected from disclosure by the attorney-client privilege and the fiduciary-duty exception does not apply. Discovery orders are generally subject to an abuse of discretion standard of review; however, we review the circuit court's determination of whether a privilege applies *de novo*. *Mueller Industries, Inc. v. Berkman*, 399 Ill. App. 3d 456, 463 (2010).

¶ 14       The purpose of the attorney-client privilege is to encourage clients to engage in full and frank discussion with their attorneys without the fear of compelled disclosure of information. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991). However, the privilege has limits and must be narrowly construed. *Waste Management*, 144 Ill. 2d at 190. Under Illinois law, the attorney-client privilege protects "communications which the claimant either expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such." *Id*.

¶ 15       The fiduciary-duty exception to the attorney-client privilege arose in the context of trust law, and was based on the principle that the beneficiary of a trust had a right to the production of legal advice rendered to the trustee *relating to the administration of the trust*. *Mueller*, 399 Ill. App. 3d at 468. The theory behind the exception was that because the advice was obtained using the authority and funds of the trust and the beneficiary was the ultimate recipient of the benefit of the advice, the beneficiary was entitled to discover the communications between the attorney and the fiduciary. *Id*. The fiduciary-duty exception does not, however, apply to legal advice rendered concerning the personal liability of the fiduciary or in anticipation of adversarial legal proceedings against the fiduciary. *Id*. at 469.

¶ 16       As this court recently noted in *Garvy v. Seyfarth Shaw LLP*, 2012 IL App (1st) 110115, ¶ 35, Illinois has not adopted the fiduciary-duty exception to the attorney-client privilege.[1] See also *Mueller*, 399 Ill. App. 3d at 469. In *Garvy*, the client was sued as a result of advice allegedly given by the law firm. *Garvy*, 2012 IL App (1st) 110115, ¶¶ 4-8. When the client asked the law firm to represent him in the suit, the law firm responded by sending a letter in which it detailed the conflict of interest resulting from the firm's role in providing the legal advice that formed the basis of the suit. *Id*. ¶¶ 8-11. The client retained independent counsel and asserted legal malpractice claims against the firm, but asked the firm to continue its representation of him in the underlying suit. *Id*. ¶ 12. The client then sought production of all communications between the firm and its in-house and outside counsel relating to his malpractice claims against the firm. *Id*. ¶ 15.

¶ 17       In *Garvy*, this court discussed a recent United States Supreme Court decision that examined the history of the fiduciary-duty exception to the attorney-client privilege in American law. *Id*. ¶ 35 (citing *United States v. Jicarilla Apache Nation*, 564 U.S. ___, 131 S. Ct. 2313 (2011)). In *Jicarilla*, the Supreme Court acknowledged that the leading case on

---

[1]The slip opinion in *Garvy* is subject to modification or correction until it has been released for publication.

the fiduciary exception is *Riggs National Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709 (Del. Ch. 1976), and discussed the factors considered by the *Riggs* court in determining the "real client" to whom the attorney-client privilege properly belongs. *Jicarilla*, 564 U.S. at ___, 131 S. Ct. at 2321-22. One of the factors considered was whether there were any adversarial proceedings pending between the fiduciary and the beneficiary at the time the legal advice was sought. *Id*. at ___, 131 S. Ct. at 2322 (citing *Riggs*, 335 A.2d at 712). This factor was important because, if adversarial proceedings were pending, it would indicate that the fiduciary was seeking legal advice in a personal rather than a fiduciary capacity, and the exception would not apply. *Id*. This court concluded that even if Illinois did recognize the fiduciary-duty exception, it would not apply where the fiduciary sought legal advice in connection with the client's legal malpractice claims against the fiduciary. *Garvy*, 2012 IL App (1st) 110115, ¶ 35.

¶ 18    It is clear that the same reasoning applies to the communications sought by MDA from both in-house and outside counsel related to threatened litigation by MDA. The remaining communications sought by MDA relate to the motions to disqualify that were filed in both the chancery action and the arbitration proceedings in which DLA represented MDA. We note that there is nothing in the record to indicate that any malpractice claims had been asserted by MDA at the time the motions to disqualify were filed. Indeed, the motions to disqualify were filed in June 2006, DLA hired Quinlan in July 2006, and MDA did not file its legal malpractice action against DLA until May 2008.

¶ 19    In determining the "real client" to whom the attorney-client privilege properly belongs, the *Riggs* court also considered which party was the intended beneficiary of the legal advice sought and, most importantly, who paid for that advice. *Jicarilla*, 564 U.S. at ___, 131 S. Ct. at 2322 (citing *Riggs*, 335 A.2d at 712). The *Riggs* court noted that the issue of payment for the advice sought was " 'a strong indication of precisely who the real client[ ] [was].' " *Id*. (quoting *Riggs*, 335 A.2d at 712). The record discloses that DLA sent MDA a letter in which it stated that it would not charge MDA any legal fees incurred in connection with arguing the motion to disqualify because the motion was based on an alleged conflict involving DLA. Moreover, Campbell's affidavit states that DLA hired Quinlan to represent it in its opposition to the motion to disqualify and Quinlan was paid by DLA. Finally, although MDA can claim an interest in the ultimate ruling on the motion to disqualify, the motion itself was not directed to the merits of MDA's position but to the alleged conflict involving DLA and, therefore, DLA was the beneficiary of the advice sought. Thus, even if we were to extend Illinois law by adopting the fiduciary-duty exception, which we decline to do on the facts here, the exception would not apply to the communications in question.

¶ 20    Although MDA specifically argued in terms of the fiduciary-duty exception in the proceedings below, it now contends that DLA could not establish that the attorney-client privilege applies to the communications at issue because DLA could have had no expectation that communications about an existing client would be confidential. Thus, MDA contends, because DLA has not established that the communications at issue are privileged, MDA does not have the burden of establishing that an exception to the privilege applies. MDA argues that DLA could have no expectation of confidentiality because the rules that govern attorney conduct require disclosure to current clients and because one of the fiduciary duties owed by

an attorney is a duty to disclose all material information about its representation to the client.

¶ 21     This court considered and rejected similar arguments in *Garvy*, concluding that, while an attorney's fiduciary duties to his client and the rules governing attorney conduct may be relevant to the underlying malpractice claims, they have no relevance to a determination of whether the attorney-client privilege applies to certain communications. *Garvy*, 2012 IL App (1st) 110115, ¶¶ 39, 41. We observed that an argument that there can never be an expectation of confidentiality on the part of a fiduciary based on the duties a fiduciary owes "is simply an attempt to avoid a discussion of the applicability of the fiduciary-duty exception by calling it something other than an exception, thereby rendering the exception itself meaningless." *Id*. ¶ 39.

¶ 22     Moreover, the fact that Rules 1.4 and 1.7 of the Illinois Rules of Professional Conduct (Ill. Rs. Prof'l Conduct Rs. 1.4, 1.7 (eff. Jan. 1, 2010)) impose requirements to keep clients reasonably informed regarding issues related to their representation and prohibit representation involving a concurrent conflict of interest has no relevance whatsoever to the issue of whether an attorney can have an expectation of confidentiality. As this court noted in *Garvy*, the rules also recognize that "[a] lawyer's confidentiality obligations do not preclude a lawyer from securing *confidential* legal advice about the lawyer's personal responsibility to comply with these Rules" (emphasis added) (Ill. Rs. Prof'l Conduct R. 1.6(b)(4) cmt. 9 (eff. Jan. 1, 2010)), and that lawyers are permitted to make confidential reports of ethical issues to designated firm counsel (Ill. Rs. Prof'l Conduct R. 5.1 cmt. 3 (eff. Jan. 1, 2010)). *Garvy*, 2012 IL App (1st) 110115, ¶ 40.

¶ 23     MDA also argues that under the doctrine of dual representation, DLA could not have reasonably expected its communications with in-house and outside counsel to be confidential. In *Mueller*, this court addressed the dual representation doctrine in the context of two external clients of the law firm. *Mueller*, 399 Ill. App. 3d at 464. The *Mueller* court held that the attorney-client privilege did not apply where one client knew that the law firm represented another client on matters related to its representation of him, and could not reasonably have expected that his communications with his attorney on those matters would be confidential. *Id*. at 465. However, the *Mueller* court limited its holding to communications related to a plumbing supply company, the interest the two clients had in common. *Id*. Even if we were to conclude that DLA representing itself is analogous to the representation of an external client, MDA has not explained what common interest is involved in the communications at issue such that DLA could have no expectation of confidentiality. DLA sought legal advice concerning its professional obligations to a client. It did not seek legal advice relating to a common interest with MDA, thus, the dual representation doctrine is not applicable.

¶ 24     DLA also contends that even if this court should adopt the fiduciary-duty exception and determine that it applies, the circuit court erred in ordering the production of communications after August 6, 2007, the date DLA was disqualified as MDA's counsel. The privilege log includes communications dated as late as July 2009. MDA contends that the date DLA's representation of MDA ended is October 30, 2007, and that the privilege log includes 14 documents dated after that date. MDA argues that these 14 documents are discoverable under the crime-fraud exception to the attorney-client privilege. MDA acknowledges that the circuit

court did not reference the crime-fraud exception in its ruling.

¶ 25    The crime-fraud exception to the attorney-client privilege is recognized in Illinois and applies when a client "seeks or obtains the service of an attorney in furtherance of criminal or fraudulent activity." *In re Marriage of Decker*, 153 Ill. 2d 298, 313 (1992). The party invoking the exception must show that the client knew or should have known that the conduct was unlawful. *Id*. at 314. The exception does not apply to good-faith consultations with an attorney about the legal implications of a proposed course of action, even if it is later determined that the course of action was improper. *Id*. Because the communication itself is often the only evidence of whether the exception applies (*id*. at 322), our supreme court has adopted the United States Supreme Court's approach to establishing the crime-fraud exception detailed in *United States v. Zolin*, 491 U.S. 554 (1989) (*Decker*, 153 Ill. 2d at 324-25). Once an adequate showing has been made to support a good-faith belief " 'that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies' [citation]," the trial court has the discretion to conduct such an inspection or to defer it if the court believes unprivileged information will be presented later to support the exception. *Id*. at 324. Our supreme court further noted that, where possible, it would be prudent to have another trial judge conduct the inspection once the initial threshold has been met due to the inherent problem in having the trial court view information that may, in fact, be privileged. *Id*. at 325.

¶ 26    MDA relies on *Mueller*, 399 Ill. App. 3d at 471, for the proposition that an intentional breach of fiduciary duty is sufficient to serve as the fraud necessary to establish the crime-fraud exception. This reliance is misplaced. The *Mueller* court first determined that the evidence in that case suggested that the law firm assisted one client in setting up an interest in one of the other client's suppliers and concealing that interest from the other client, and also in forming a competitor to the other client while under its employ. *Id*. at 470-71. Thus, this court's conclusion that an intentional breach of fiduciary duty may serve as the fraud necessary to establish the crime-fraud exception was based not on the counts alleged in the complaint, but on the evidence that was presented to support the allegations in the complaint.

¶ 27    MDA's complaint asserts that DLA breached its fiduciary duty by fraudulently concealing its representation of Walsh-related entities. However, the party seeking discovery may not simply rest on the allegations of the complaint to establish that the crime-fraud exception applies. *Id*. at 470. MDA has pointed to no corroborating evidence to support the allegation of fraudulent concealment. In fact, the record contains correspondence from DLA to MDA dated June 6, 2006, in which DLA explained that although it had represented Walsh-related entities in other transactions, Walsh had never claimed a conflict of interest with respect to other matters in which DLA was adverse to Walsh Construction. Moreover, MDA has not shown how communications with counsel after DLA had withdrawn from its representation of MDA could have been made in furtherance of fraudulent activity. Thus, MDA has not met its burden of showing that an *in camera* review of the 14 documents in question may reveal evidence to establish that the crime-fraud exception applies.

¶ 28    Once it has been established that the information sought is protected by the attorney-client privilege, the party seeking the information has the burden of establishing that the information is not privileged, by showing that an exception to the privilege applies. *Decker*,

-8-

153 Ill. 2d at 321. MDA has not shown that any exception to the privilege applies; thus, the circuit court erred in ordering the disclosure of the communications between in-house and outside counsel related to the motions to disqualify and MDA's claims against DLA.

¶ 29 For the reasons stated, we reverse the circuit court's order directing DLA to produce the 55 documents in question. We also vacate the circuit court's contempt order against DLA (see *Cangelosi v. Capasso*, 366 Ill. App. 3d 225, 230 (2006) (noting that "[w]here a party's refusal to comply with a trial court's order constitutes a good-faith effort to secure an interpretation of the two privileges in question, it is appropriate to vacate a contempt citation on appeal")), and remand for further proceedings.

¶ 30 Reversed in part and vacated in part; cause remanded.