2024 IL App (1st) 230089
Nos. 1-23-0089 & 1-23-0141 (cons.)
Opinion filed March 1, 2024

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| JAMES S. MacDONALD, ) <br><br> Plaintiff-Appellee, ) <br><br> v. ) <br><br> SALLY WAGENMAKER; WAGENMAKER & ) OBERLY, LLC, an Illinois Corporation; and ) SCHECHTER, DOKKEN, KANTER, ) ANDREWS & SELCER, LTD., d/b/a Schechter, ) Dokken, Kanter CPAs, ) <br><br> Defendants ) <br><br><br> (Hoogendoorn & Talbot, LLP, a Nonparty ) Subpoena Respondent-Appellant; Sally ) Wagenmaker and Wagenmaker & Oberly, LLC, ) Defendants-Appellants). ) | Appeal from the Circuit Court of Cook County. <br><br><br> No. 2020 L 11785 <br><br><br> The Honorable Jerry A. Esrig, Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Oden Johnson and Justice Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1     Should the crime-fraud exception to the attorney-client privilege potentially extend to

alleged defamatory conduct by attorneys? This question requires grappling with the intricate

interplay between ethical principles and client expectations. We hold that considering defamatory conduct as a basis for applying the crime-fraud exception compromises both the privilege and the exception and reverse.

¶ 2                                                    Background

¶ 3        James S. MacDonald was the founder and former senior pastor of HBC, an Evangelical Christian megachurch. HBC terminated him in February 2019 after determining he was "biblically disqualified" from ministry for failing to be "above reproach" and having a "sinful pattern of inappropriate language, anger, and domineering behavior." According to HBC, MacDonald's conduct allegedly included "insulting, belittling, and verbally bullying others," "improperly exercising positional and spiritual authority," and "extravagant spending utilizing church resources resulting in personal benefit."

¶ 4        MacDonald initiated arbitration with the Institute of Christian Conciliation, claiming, in part, wrongful termination and improper denial of employment benefits. HBC retained Hoogendoorn & Talbot, LLP (Hoogendoorn), to represent it in the arbitration. The parties settled the arbitration in April 2021.

¶ 5        Meanwhile, HBC retained attorney Sally Wagenmaker and her firm, Wagenmaker & Oberly, LLC (W&O), to look into the church's corporate structure and finances. This required them to investigate, evaluate, and make recommendations related to corporate governance, including corporate tax and other legal compliance accountability structures "in the aftermath" of MacDonald's termination. W&O hired the accounting firm Schechter, Dokken, Kanter, Andrews, & Selcer, Ltd. (Accountants), to conduct a forensic accounting of MacDonald's transactions.

¶ 6 After giving HBC's board of elders (Board) an initial report detailing its preliminary findings and recommendations, W&O sent the Board its summary report (Wagenmaker Letter) in November 2019. The Wagenmaker Letter reached multiple conclusions about MacDonald's leadership:

"Based on our law firm's review of available information, we determined that a massive corporate governance failure apparently developed over several years at HBC, primarily due to the following factors:

• MacDonald's powerful and subversive leadership style;

• His development of an inner-circle leadership group through which he could control HBC;

• His marginalization of broader leadership, particularly the former HBC Elders; and

• His other aggressive tactics that thwarted healthy nonprofit governance.

Directly resulting from such problems, MacDonald appears to have extensively misused HBC's financial resources for improper financial benefit."

¶ 7 The Wagenmaker Letter also stated that MacDonald reaped "significant personal financial benefits, avoiding accountability to any governing board, and with heavy-fisted exclusionary leadership. His close inner circle of HBC leaders helped him to do so without the important accountability measures needed for effective nonprofit ministry governance. Such actions are obvious and patent, such as through lack of appropriate financial controls over certain bank accounts, the removal of MacDonald from the conflict of interest policy's coverage, his spending, and the lack of proper executive compensation evaluations."

¶ 8        HBC posted the Wagenmaker Letter on its website along with a letter from the Accountants to Wagenmaker (Accountant Letter), summarizing the findings of forensic analysis of purported financial irregularities. On the same day, two HBC elders read a statement to the congregation (the Laird-Stoner Statement), summarizing the Wagenmaker Letter. MacDonald alleges the Laird-Stoner Statement included intentionally false and salacious details not included in the published versions of the Wagenmaker and Accountant Letters.

¶ 9        HBC also posted on its website the findings of its disqualification investigation (DQ Statement) "to provide clarity to our church family" about its reasons for terminating MacDonald nearly nine months earlier. The DQ Statement, which MacDonald alleges W&O helped draft, stated that HBC's disqualification investigation "led us to conclude that [MacDonald] had a substantial pattern of sinful behavior." According to the DQ Statement, MacDonald "made repeated efforts to profit himself beyond what was honorable" and displayed a "pattern of extravagant spending utilizing church resources resulting in personal benefit." It concluded that MacDonald's conduct "biblically disqualified [him] from the position of Elder."

¶ 10       MacDonald sued Wagenmaker, W&O, and the Accountants, alleging the Wagenmaker and Accountant Letters included provably false and defamatory statements intended to destroy his reputation with the HBC congregation and the evangelical Christian community. MacDonald alleged Wagenmaker and W&O aided and abetted HBC in making other defamatory statements about him, including helping HBC draft the DQ Letter and the Laird-Stoner Statement.

¶ 11       Further, MacDonald asserted that defendants conspired to defame him to help HBC gain an advantage in the arbitration. Specifically, MacDonald alleged that W&O, HBC, and the

Accountants delayed responding to his arbitration demand until after publicly defaming him and then filing counterclaims that aligned with the false statements. He alleged the law firms and HBC defrauded HBC's insurance company by falsely stating that Wagenmaker was part of HBC's defense team in the arbitration so the insurance company would pay her legal fees.

¶ 12     MacDonald's amended complaint alleged claims of defamation *per se*, false light invasion of privacy, invasion of privacy (intrusion on seclusion), and civil conspiracy against Wagenmaker, W&O, and the Accountants, and aiding and abetting defamation *per se* and aiding and abetting false light invasion of privacy against Wagenmaker and W&O.

¶ 13     During discovery, MacDonald subpoenaed W&O and Hoogendoorn, seeking communications among the law firms, HBC, and the Accountants. The law firms moved to quash the subpoenas and declined to produce certain communications, arguing the attorney-client privilege. (The Accountants produced requested communications; neither the Accountants nor HBC are parties to the appeal.)

¶ 14     MacDonald filed a motion to compel, arguing, in part, that the crime-fraud exception overcame the attorney-client privilege. MacDonald asserted that other jurisdictions have found the crime-fraud exception encompasses communications in furtherance of an intentional tort or a conspiracy. He argued the trial court should apply the exception because W&O engaged in a conspiracy with HBC, Hoogendoorn, and the Accountants to destroy his reputation by publishing defamatory material on the HBC website and to the congregation. In response, the law firms argued that (i) Illinois has not extended the crime-fraud exception to conspiracy or tort claims other than fraud, and (ii) MacDonald failed to make a *prima facie* case for applying the exception, having presented no evidence supporting his allegations.

¶ 15    The trial court rejected the law firms' argument that Illinois Supreme Court precedent, including *In re Marriage of Decker*, 153 Ill. 2d 298 (1992), precludes expanding the exception beyond criminal and fraudulent conduct. Instead, the trial court ruled that the crime-fraud exception "may extend to potential torts that involve deliberate misrepresentations, including defamation." The court relied on *Radiac Abrasives, Inc. v. Diamond Technology, Inc.*, 177 Ill. App. 3d 628, 638 (1988), where it noted, "that certain activities which plaintiff has alleged defendants undertook, such as the selling of equipment to a third party with the intent to repurchase it later, may be in breach of a fiduciary duty owed to plaintiff. Therefore, to the extent that there were communications between defendants and their counsel related to the selling and buying of plaintiff's equipment, such communications may be subject to the crime-fraud exception." The trial court concluded that *Radiac* suggested the appellate court was "not construing the exception narrowly to only cases involving crime or fraud." The court also found persuasive *Safety Today v. Roy*, No. 2:12-cv-510, 2013 WL 5597065, at \*6 (S.D. Ohio Oct. 11, 2013), where an Ohio federal district court found that a counterdefendant's conduct in tortious interference with contract or business relations claim to be "sufficiently akin to fraud" to explore whether the crime-fraud exception applied.

¶ 16    After finding the crime-fraud exception could apply, the trial court addressed "whether plaintiff has made a showing sufficient to justify an *in-camera* inspection of certain documents." The court did not hold an evidentiary hearing but found MacDonald met his burden based on his pleadings. The court said W&O "essentially drafted the alleged lead defamatory letter," and the Hoogendoorn attorney made revisions or suggestions before publication. The court also said that HBC sought advice from Hoogendoorn about whether to proceed with publication, which the Hoogendoorn lawyers provided. The court ordered that

the law firms tender for "*in-camera* inspection \*\*\* all communications for which attorney-client privilege is asserted that either predate or are contemporaneous with the allegedly defamatory publication and which relate broadly to the preparation, drafting, publication of the letter or advice relating thereto."

¶ 17    After reviewing the communications *in camera*, the trial court concluded that the attorney-client privilege had been waived:

"because there is substantial evidence, that HBC knew or strongly suspected that it was about to commit a tort, No. 1; and, No. 2, that it enlisted the help of its lawyers to commit that tort.

Not only did the lawyers draft the allegedly defamatory material and conduct the investigation that resulted in the drafting of the allegedly defamatory material, but HBC also enlisted the help of the lawyers pre-tort to obtain permission to publish from [the Accountants].

Where the original \*\*\* engagement required these materials to be kept confidential, it was the lawyers at the request of HBC who went to the [Accountants] and obtained their permission to allow the material to be published.

And, second of all, the clients went to the lawyers and the lawyers provided them with advice on a way to potentially avoid liability for defamation, not by avoiding defamation, but by looking to an ecclesiastical privilege that would have excused what otherwise would have been tortuous [sic] behavior and there are documents which I've examined which support that evidence.

\* \* \*

So I think there is evidence in this case not only that \*\*\* HBC was aware that the conduct had a strong likelihood of being defamatory, but that even as of the time they made the decision to publish, and subsequent to that decision they were seeking the lawyers' advice to help them implement that decision, and the lawyers participated in that decision, so that's the reason that I have—that I believe the crime-fraud exception to the privilege is applicable here \*\*\*."

¶ 18    The trial court listed documents for W&O and Hoogendoorn to provide MacDonald. W&O filed a motion, which Hoogendoorn later joined, seeking a "friendly" order of contempt and assessment of a nominal penalty so they could immediately appeal. The trial court granted the motion, entering an order of contempt against Wagenmaker, W&O, and Hoogendoorn and assessing a $100 penalty against the law firms. W&O and Hoogendoorn filed separate interlocutory appeals, which we consolidated.

¶ 19                                          Analysis

¶ 20                                    Standard of Review

¶ 21    Generally, we review rulings on discovery matters for an abuse of discretion. *Sterling Finance Management, L.P. v. UBS PaineWebber, Inc.*, 336 Ill. App. 3d 442, 446 (2002). "A trial court, however, lacks the discretion to compel the disclosure of information that is privileged." *Id.* (citing *In re Marriage of Daniels*, 240 Ill. App. 3d 314, 324 (1992)). Thus, we review *de novo* the circuit court's determination of whether a privilege applies. *MDA City Apartments LLC v. DLA Piper LLP (US)*, 2012 IL App (1st) 111047, ¶ 13; see *People v. Radojcic*, 2013 IL 114197, ¶ 35 (applying *de novo* standard of review to application of crime-fraud exception, as pure question of law). *De novo* consideration means we perform the same analysis as a trial court. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 22                                    Attorney-Client Privilege

¶ 23        The attorney-client privilege serves as a powerful safeguard to fostering uninhibited communication, confidence, and trust between client and lawyer, which is crucial for a fair legal process. The oldest privilege for confidential communications known to the common law (8 John H. Wigmore, Evidence § 2290, at 542 (McNaughton rev. ed. 1961)), the attorney-client privilege refers to a client's right to refuse disclosure of confidential communications made to obtain legal advice. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000). The privilege belongs to the client, and an attorney may assert it on a client's behalf. *Decker*, 153 Ill. 2d at 313.

¶ 24        The attorney-client privilege, like all testimonial privileges, inherently limits the search for truth by preventing "otherwise relevant and admissible evidence from being disclosed." *People v. Knuckles*, 165 Ill. 2d 125, 135 (1995). Courts narrowly interpret the privilege. See *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991).

¶ 25        The party requesting the information must establish that an exception applies. *Decker*, 153 Ill. 2d at 313, 321; *MDA City Apartments*, 2012 IL App (1st) 111047, ¶ 28 (once information determined to fall within scope of attorney-client privilege, burden on party seeking information to show exception applies).

¶ 26        Absent an exception, there is no dispute that MacDonald seeks protected communications.

¶ 27                          *Prima Facie* Showing of Crime-Fraud Exception

¶ 28        The crime-fraud exception, a "major exception to the attorney-client privilege," pertains when a client seeks the lawyer's services "in furtherance of criminal or fraudulent activity." *Decker*, 153 Ill. 2d at 313; *Radojcic*, 2013 IL 114197, ¶ 43 (exception applies when client seeks or obtains attorney services to further "ongoing or future crime or fraud" (internal quotation

marks omitted)). The exception's rationale recognizes a lawyer's professional services should not assist in committing a crime or fraud; advice given for those purposes would amount to participating in a conspiracy. See *Decker*, 153 Ill. 2d at 313; see also Ill. R. Prof'l Conduct (2010) R. 1.2(d) (eff. Jan. 1, 2016) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent ***."). "[W]here the crime-fraud exception applies, no attorney-client privilege exists whatsoever ***." *Decker*, 153 Ill. 2d at 313. This exception bears on communications made in preparation for or after the commencement of the fraudulent activity. *Mueller Industries, Inc. v. Berkman*, 399 Ill. App. 3d 456, 470 (2010).

¶ 29    Good faith consultation with an attorney regarding the legality of a possible course of action does not fall within the crime-fraud exception's scope. Thus, the primary issue in determining whether the exception applies involves the client's intent to retain the attorney's service. *Radiac*, 177 Ill. App. 3d at 635. To show the crime-fraud exception applies, a party must demonstrate that, when consulting the attorney, the client knew or should have known that the intended conduct was illegal. *Decker*, 153 Ill. 2d at 314. The party seeking disclosure cannot simply rely on allegations of illegality or fraud unsupported by evidence but must make a *prima facie* showing. *Id.* at 321.

¶ 30    In *Decker*, the court adopted the procedure set out by the United States Supreme Court in *United States v. Zolin*, 491 U.S. 554 (1989). *Decker*, 153 Ill. 2d at 322-23. The party challenging the assertion of privilege must first make a "threshold evidentiary showing to trigger [an *in camera*] review." *Id.* at 323. To meet this evidentiary threshold, the proponent of the crime-fraud exception must demonstrate that a " 'prudent person' " would have a " 'reasonable basis to suspect' ": (i) " 'the perpetration or attempted perpetration of a crime or

fraud' " and (ii) " 'that the communications were in furtherance thereof.' " *Id.* at 322 (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984)). " 'To satisfy the "in furtherance of" element of the crime-fraud exception, a logical link must exist between the privileged communication and the proposed crime or fraud. That is, the legal advice must relate to future illicit conduct by the client; it must be the causa pro causa, the advice that leads to the deed.' " *Kroll v. O'Connor*, No. 19 C 3919, 2021 WL 4516393, at *1 (N.D. Ill. Feb. 10, 2021) (quoting *Sonrai Systems, LLC v. Romano*, No. 16 C 3371, 2020 WL 7027567, at *9 (N.D. Ill. Nov. 30, 2020)) (applying Illinois law). Once the party seeking discovery satisfies its burden, the trial court may conduct an *in camera* inspection. See *Decker*, 153 Ill. 2d at 321.

¶ 31    The law firms contend the trial court erred in ordering an *in camera* inspection because MacDonald failed to make a *prima facie* case that the crime-fraud exception applied. We agree.

¶ 32    As noted, the trial court did not hold an evidentiary hearing but instead ruled based on MacDonald's motion to compel and the law firms' responses. In his initial motion, MacDonald supported his contention that the crime-fraud exception should apply by citing to the allegations of his amended complaint, where he alleged that W&O conspired with HBC to destroy his reputation. In his reply to his motion, MacDonald asserted that "the crime-fraud exception to the privilege also applies where, as here, HBC's communications with its attorney were intended to further its tortious and fraudulent actions" and he "can make a threshold showing that the defamatory statements satisfy the elements of fraud upon supporters of his *** ministry." Thus, MacDonald offered allegations but no evidence.

¶ 33    Nonetheless, in ordering an *in camera* review, the trial court found "evidence that both the W and O attorneys essentially drafted the alleged lead defamatory letter, and that [the

Hoogendoorn] attorney made revisions or suggestions prior to publication" and HBC "sought advice from [Hoogendoorn] attorneys as to whether to go forward with publication and that the lawyers gave such advice." Significantly, the trial court did not say that "evidence" showed HBC sought the advice with the intent to defame MacDonald (assuming the fraud exception reaches defamation) or that the lawyers' representation was anything other than in good faith or that HBC knew or should have known the statements it published were defamatory. Again, " 'the proponent of the evidence must show that the client, when consulting the attorney, knew or should have known that the intended conduct was unlawful." (Internal quotation marks omitted.) *Id.* at 314 (quoting *Radiac*, 177 Ill. App. 3d at 635). And "[g]ood-faith consultations with attorneys by clients who are uncertain about the legal implications of a proposed course of action are entitled to the protection of the privilege, even if that action should later be held improper." (Internal quotation marks omitted.) *Id.*

¶ 34    MacDonald's allegations cannot support an *in camera* review under the requirements set forth in *Zolin* and adopted in *Decker*. The trial court erred in ordering an *in camera* inspection.

¶ 35                    Crime Fraud Exception in Defamation Cases

¶ 36    The law firms also contend the trial court erred in finding that the crime-fraud exception applies to MacDonald's claims. MacDonald does not allege, and the trial court did not find, that the law firms engaged in fraudulent conduct. Instead, the trial court found that *Radiac* (and cases from other jurisdictions) support applying the exception to intentional torts, including deliberate misrepresentations that constitute defamation. We disagree.

¶ 37    In *Radiac*, an employer sued former employees who formed a rival corporation, alleging breach of fiduciary duty, conspiracy, conversion, and interference with contractual relations. The employer also sought a preliminary injunction to bar one of its at-will employees from

working for the rival corporation. *Radiac*, 177 Ill. App. 3d at 630. The trial court denied the preliminary injunction motion, and the appellate court affirmed. Although not necessary to its disposition, the appellate court addressed the employer's contention that certain communications between the defendants and their attorneys relating to preliminary steps they took to set up the competing business constituted breaches of fiduciary duty and came under the crime-fraud exception to the attorney-client privilege because it was likely to recur at trial. *Id.* at 634.

¶ 38    The appellate court concluded that defendants did not breach their fiduciary duties to their employer by taking preliminary steps to organize a competing company. *Id.* at 638. But the court added that "certain activities which plaintiff has alleged defendants undertook, such as the selling of equipment to a third party with the intent to repurchase it later, may be in breach of a fiduciary duty owed to plaintiff. Therefore, to the extent that there were communications between defendants and their counsel related to the selling and buying of plaintiff's equipment, such communications may be subject to the crime-fraud exception." *Id.* The trial court found that *Radiac* suggests the crime-fraud exception is not limited to criminal or fraudulent conduct but can be applied more broadly. Then, relying on MacDonald's allegation that the law firms drafted or helped draft the allegedly defamatory letters and advised HBC about whether to publish them, the court ruled an *in camera* inspection was warranted.

¶ 39    The law firms acknowledge that some courts in Illinois and other jurisdictions have applied the crime-fraud exception to conduct not explicitly criminal or fraudulent where (i) the conduct rose to the level of fraud or was akin to fraud or (ii) the conduct in the litigation was fundamentally inconsistent with the basic premise of the adversary system. They assert that because neither situation exists here, we should reverse.

¶ 40     A case in which the court found alleged conduct reaching the level of fraud is *Mueller*, 399 Ill. App. 3d 456. There, the plaintiff corporation sued its former president for breaches of contract and fiduciary duty, alleging the president formed a competing company and received bribes and kickbacks from one of the corporation's primary suppliers. In response to the corporation's discovery requests, the defendant argued that the attorney-client privilege protected certain documents. The trial court held that the privilege did not shield the requested documents, and the appellate court affirmed. The court held that although the corporation "did not plead fraud *per se*," "an intentional breach of fiduciary duty may serve as the fraud necessary to establish the crime-fraud exception." *Id.* at 471.

¶ 41     But in *MDA City Apartments*, 2012 IL App (1st) 111047, plaintiffs failed to connect the conduct to fraud. The plaintiff sued its former law firm, alleging it committed legal malpractice by failing to disclose conflicts of interest and adequately prepare for arbitration. When the law firm refused to turn over requested documents in discovery on the grounds of attorney-client privilege, the plaintiff argued the fiduciary duty exception applied. In rejecting that argument, the appellate court first noted that Illinois had not adopted the fiduciary-duty exception to the attorney-client privilege. *Id.* ¶ 16. Further, the court rejected the plaintiff's reliance on *Mueller* "for the proposition that an intentional breach of fiduciary duty is sufficient to serve as the fraud necessary to establish the crime-fraud exception." *Id.* ¶ 26.

¶ 42     Other jurisdictions have applied the crime-fraud exception where the alleged wrongful conduct was "akin to fraud," which, although not defined, appears to fall below conduct rising to the level of fraud. For instance, in *Safety Today*, 2013 WL 5597065, at *6, which the trial court cited, the court applied the exception to claims of tortious interference with business relations and defamation. The court noted that two elements of the tortious interference claim

are (i) "the wrongdoer's intentional procurement" of an interference and (ii) "lack of justification," which "require[s] the specific intent to commit a wrongful act." (Internal quotation marks omitted.) *Id.* The court "ha[d] little difficulty in concluding that the conduct alleged \*\*\* is sufficiently akin to fraud to permit the Court to explore further the applicability of the crime-fraud exception." *Id.*

¶ 43    Accepting MacDonald's contention and the trial court's expansive reading of the crime-fraud exception, MacDonald's complaint fails to allege that the law firms engaged in conduct on the level of fraud, as in *Mueller*, or conduct akin to fraud, as in *Safety Today*. Common-law fraud requires (i) a false statement of a material fact, (ii) defendant's knowledge the statement was false, (iii) defendant's intent that the statement induce plaintiff to act, (iv) plaintiff's reliance on the truth of the statement, and (v) damages from relying on the statement. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).

¶ 44    MacDonald alleged that in response to his arbitration demand, HBC and its attorneys conducted a public smear campaign to publicize false and defamatory information about him to the HBC congregation and the wider Evangelical Christian community. He also asserted HBC and its attorneys delayed responding to his arbitration demand until after the publication of the defamatory statements to gain an advantage in the arbitration. Even if true, this conduct is not fraudulent or akin to fraud, as it was not intended to induce MacDonald to act, nor did MacDonald rely on the truth of the statements. MacDonald alleges traditional defamation claims, not fraud. And, as noted, MacDonald presented no evidence showing HBC sought advice from its attorneys with the intent to defame him. Extending the crime-fraud exception to claims like MacDonald's would risk deterring clients from seeking legal advice, chilling

lawyers from giving advice, and eroding the attorney-client privilege's protection of legitimate communications.

¶ 45    MacDonald's motion to compel also alleged HBC intended to defraud the church's insurance company by falsely claiming Wagenmaker participated in the defense of the arbitration proceeding without informing the insurer. In short, HBC deceived the insurer to pay Wagenmaker, not for HBC's legal defense in the arbitration, but to engage in an "offensive assault" against him. Further, MacDonald argues this would be a fraud on the court. The record does not support this, as HBC's insurer was paying to defend against MacDonald's defamation and false light invasion privacy claims from the outset of the arbitration proceeding because he included them in his arbitration request. Further, even if true, a claim of fraud against the insurance company, which is not a party, would not provide MacDonald grounds for arguing the crime-fraud exception applied to his defamation claims. The trial court likely agreed as it did not address this argument.

¶ 46    Courts have enforced the crime-fraud exception where alleged conduct, although neither criminal nor fraudulent, is "fundamentally inconsistent with the basic premises of the adversary system" or deemed a fraud on the court. (Internal quotation marks omitted.) See *Sonrai Systems*, 2020 WL 7027567, at \*8; *Rambus, Inc. v. Infineon Technologies AG*, 220 F.R.D. 264, 280-82 (E.D. Va. 2004) (spoliation of evidence); *Hudgins v. Total Quality Logistics, LLC*, No 16-cv-7331, 2022 WL 1262082, at \*4 (N.D. Ill. Mar. 1, 2022) ("knowing pursuit of baseless litigation is sufficient" (internal quotation marks omitted)). MacDonald has not demonstrated that the discovery involves conduct fundamentally inconsistent with the adversary system.

¶ 47   Because the trial court erred in applying the crime-fraud exception, we reverse the orders regarding the *in camera* review and disclosure to MacDonald. We also reverse the order holding the law firms in contempt.

¶ 48   Reversed and remanded.

*MacDonald v. Wagenmaker*, 2024 IL App (1st) 230089

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-L-11785; the Hon. Jerry A. Esrig, Judge, presiding. |
| **Attorneys for Appellant:** | Kevin J. Todd, Richard D. Boonstra, and Todd A. Postma, of Hoogendoorn & Talbot LLP, of Chicago, for appellant Hoogendoorn & Talbot LLP. |
| | Michael J. Meyer and Jeremy N. Boeder, of Tribler Orpett & Meyer, P.C., of Chicago, for other appellants. |
| **Attorneys for Appellee:** | Michael J. Scotti III and Andrew C. Clott, of Roetzel & Andress, LLP, of Chicago, for appellee. |