2026 IL App (1st) 252326-U

No. 1-25-2326B

SECOND DIVISION
February 10, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 0324101 |
| | ) | |
| QUINTON DIXON, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D. B. WALKER delivered the judgment of the court.
Justice McBride and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's decision to detain defendant.

¶ 2    Defendant Quinton Dixon appeals the trial court's order denying his motion for relief pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. April 15, 2024). On appeal, he contends that the State failed to show by clear and convincing evidence that (1) the proof is evident, or the presumption is great, that he committed the offense of first degree murder where no witnesses identified him as the shooter, (2) he posed a real and present threat to the safety of any person or

the community where he had no criminal history, and (3) no condition or combination of conditions could mitigate his threat to the community. Defendant also contends that the trial court failed to comply with section 6.1(h)(1) of the Code of Criminal Procedure (Code) (725 ILCS 5/110-6.1(h)(1) (West 2024)), where the court's order denying him pretrial release was not based on specific articulable facts of the case. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On May 22, 2021, defendant was charged with first degree murder in connection with the shooting death of Jerry Thornton. On March 1, 2022, the State filed a petition for a hearing to deny bail, which was granted. An amendment to section 110 of the Code, commonly known as the Pretrial Fairness Act, went into effect on September 18, 2023. The amendment abolished monetary bail in favor of a presumption of pretrial release on personal recognizance or with conditions. *People v Clark*, 2024 IL 130364, ¶ 1.

¶ 5      On June 11, 2025, defendant filed a "Petition to Grant Pretrial Release Under New Law." In the petition, defendant alleged that he was presently detained without bail. He stated that he was 25 years old, a graduate of Morton East High School, worked at Meijer while in school, played high school football, and was a father to a five-year old boy. He attached a report showing public safety assessment (PSA) scores of 2 out of 6 on the new criminal activity scale, and a failure to appear score of 1 out of 6. The report recommended that "[i]f released, [defendant should receive] maximum conditions."

¶ 6      On June 13, 2025, the State filed a "Petition for Pretrial Detention Hearing." The State alleged that defendant was charged with a detainable offense under section 110-6.1(a) of the Code, that he posed a real and present threat to the safety of any person or the community based on specific articulable facts of the case, and that no combination of conditions could mitigate that risk.

An addendum attached to the petition set forth the State's proffer regarding the facts of the case. The petition did not have an assistant state's attorney's signature on the line provided on the form.

¶ 7    A hearing commenced on July 3, 2025. Before it began, the trial court acknowledged that both parties had filed petitions. The court stated that it had "read the filings. But if you would like to expand on that or emphasize anything counsel for the defense, you are welcome to go ahead." Defense counsel responded, "I am so used to the State going forward. Their petition." The assistant state's attorney proceeded to present the State's proffer.

¶ 8    According to the proffer, defendant and Thornton were "biological cousins." Defendant and Thornton, as well as two witnesses who were with Thornton at the time of the shooting, worked for a drug dealer in the area. On May 22, 2021, just after midnight, Thornton and two witnesses were in a rented Nissan Altima traveling westbound on the I-290 expressway. Thornton was driving. They exited the highway onto the Austin ramp, and their vehicle stopped in traffic as they waited to turn on to Austin.

¶ 9    While they were stopped, a red Ford Fusion pulled up next to the Nissan. The Ford was registered to defendant. The driver of the Ford extended his arm out of the driver's side window and fired multiple shots into the Nissan's front passenger side, shattering the window. One passenger in the Nissan suffered an eye injury from the shattered glass, and Thornton was struck in the neck with a bullet. Thornton subsequently died from his injuries. Since the shooter wore a mask, the surviving witnesses were unable to identify him. The police recovered a spent 40-caliber shell casing near Thornton's vehicle.

¶ 10    In their investigation, Illinois State Police obtained surveillance video and evidence from license plate readers showing that the Ford had been following the Nissan for some time prior to the shooting and then fled after the shooting. According to the State's proffer,

"Video shows the defendant's car driving aggressively to overtake other vehicles so it could continue to follow the victim. The license plate reader on I-290 at 5200 West shows the defendant's vehicle was only three seconds behind the victim's vehicle [at] approximately one minute before the murder.

The defendant's cell phone records were eventually recovered in this case and the cell site data corroborates the path of the vehicle traveling, as well as [the vehicle] being at the location at the time of the murder."

¶ 11 The State proffered that defendant was stopped by police in the Ford Fusion earlier that day for texting while driving. The police located the Ford four days after the shooting at defendant's residence. After obtaining a search warrant, police recovered an expended 40-caliber shell casing in the glove box and another expended casing near the window wipers on the outside of the windshield. Testing indicated that all three recovered shell cases were fired from the same weapon, and the Ford tested positive for gun residue.

¶ 12 Records showed that defendant "sent his grandfather, a retired police officer, incriminating text messages after the murder indicating that he needed to get out of town and that news articles *** did not describe the vehicle that was used."

¶ 13 Based on the proffer, the State argued that defendant was a flight risk. He was also a danger to the community, and to the witnesses in particular, based on the facts of the case and the fact that "he fired a firearm into a vehicle on [the] I-290 expressway." The State argued that no combination of conditions could mitigate the risk posed by defendant because with electronic monitoring, "he would have the ability for two [days] to have unfettered movement throughout Cook County, as well as his ability to, quote, unquote, get out of town early." The State requested that defendant "remain detained throughout the proceedings."

¶ 14    Defense counsel argued that defendant was not a flight risk because he was apprehended in the Chicago area, which showed he did not flee. Counsel questioned whether the evidence indicated defendant committed the offense where no witness identified him as the shooter, and female DNA, as well as DNA from an unknown male, was recovered from the Ford. This evidence indicated that defendant was not the sole user of the vehicle. Counsel argued that although defendant's cell phone was traced to the Ford at the time of the shooting, someone could have taken his phone. Counsel emphasized that defendant had no criminal background and requested he be granted pretrial release.

¶ 15    The trial court requested a transcript from the March 1, 2022 hearing where defendant was first ordered detained without bail. The matter was continued by agreement to August 11, 2025. At the end of the hearing, defense counsel asked for leave to file an answer and to "file a motion for specificity" regarding the State's cell phone evidence and evidence of defendant's social media accounts. The trial court stated that they could address these issues at the next court date.

¶ 16    On August 11, 2025, defense counsel informed the court that defendant had filed an answer. Counsel also stated that he was "in the middle of a detention hearing" before another judge. He requested that this matter be continued to August 21, 2025. The case was continued, by agreement, to August 21st. On that date, defense counsel again requested a continuance, and the matter was continued, by agreement, to September 29, 2025.

¶ 17    At the hearing on September 29, 2025, the trial court confirmed with the parties that it was "reviewing the petition for relief[.]" The State presented a copy of text messages it believed showed defendant had tried to hide his vehicle and was planning to flee. Defense counsel stated that he had received a copy of the messages. Counsel, however, argued that the State still had not sufficiently proved that defendant would not appear in court if released. He reiterated the

arguments made at the July 3, 2025 hearing and requested that defendant be released with the condition of electronic home monitoring.

¶ 18　The State referred the trial court to its arguments at the July hearing before expanding on the flight risk element. The State read the following text message exchange:

> "I need to get out of town for *** a minute.
>
> What's up? You good? Do you need to make a move?
>
> *** I should be cool right now. That's what I'm hitting you about though. If they don't describe car [*sic*] on the article, that mean no police [*sic*] don't do nothing, right?
>
> Yep. Put your car up for a few days.
>
> I am."

According to phone records, the messages were sent about nine hours after the shooting. The State argued, 'b[]ased upon all the facts and circumstances, we ask that he remain detained through the pendency of the trial, Judge."

¶ 19　After hearing the parties' arguments, the trial court issued its ruling:

> "I appreciate Counsel's advocacy and pointing out that there could be other explanations for – maybe he was breaking up with his girlfriend or whatever it is, that he needed to get out of town and apparently he needs to put his car up for a few days, but *** considering the totality of the circumstances, *** the State is not contending that there's an eyewitness identification, but *** it's certainly the defendant's car. There's shells that were found in the car. They were also found on the scene. There's the defendant's DNA, the cell phone data.
>
> Once again, Counsel points out that it could be someone else [who] had his phone, but *** I'd have to buy a whole series of coincidences that would have an innocent

explanation [for the fact] that the car is in front of [defendant's] house [and] there's text messages which are suggestive [.] *** [C]orrect me if I'm wrong, the POD cameras or whatever data that you've made with the cell data, they had the car where the shots were fired from, like, basically following the victim's car."

The trial court further noted that the proffer showed that defendant was stopped by police in the same Ford Fusion approximately eight or nine hours before the incident. For purposes of the hearing, the trial court accepted that the text messages did not support defendant's risk for flight. However, the court found that the evidence showed "some consciousness of guilt." The trial court determined that the State proved by clear and convincing evidence that defendant committed the crime, which was a detainable offense.

¶ 20    The trial court found that electronic monitoring would not be appropriate because it "was geared towards supervising cases where the defendant is charged with a nonviolent offense. They don't have the capability to monitor someone like this where shots [were] fired from a car." The trial court then addressed the risk element. It stated that it could not "go into the dangerousness of this, but it looks like this was planned out, [there was] danger to innocent people when shots are being fired in a moving car." The court noted that one of the passengers was also injured during the shooting. The court ruled that defendant is "to remain detained." The written order simply stated that "[Defendant] to remain detained."

¶ 21    Defendant filed a motion for relief on October 28, 2025. In the motion, defendant alleged that the State's petition seeking pretrial detention "contained no signature." He argued that the State thus failed to file a verified petition as required by section 110-6.1(a) of the Code. He further argued that although he did not raise a contemporaneous objection, the issue "can survive forfeiture" because the failure to sign the petition "renders it defective pursuant to Ill. S. Ct. R.

137(a)." As a result, "[t]he proper remedy is to vacate the previous detention order and conduct a hearing whereby the Court will consider the proper conditions of pretrial release to impose, and order [defendant] released, because there is no valid Petition seeking pretrial detention on file."

¶ 22　Alternatively, defendant's motion argued that the State failed to prove by clear and convincing evidence that he committed an eligible offense, that he posed a real and present threat to the safety of any person or the community, and no condition or combination of conditions can mitigate those risks. Defendant also alleged that the order did not adequately explain the trial court's reasons for detaining him.

¶ 23　On October 31, 2025, the trial court held a hearing on defendant's motion. Defense counsel argued that the State's petition was not verified because it was not signed. Counsel stated that if the State "did attempt to file a new petition today, the defense would be objecting and moving to strike it based on timeliness ***." The State responded that the issue was forfeited because defendant did not object at the prior hearing and, in any event, the defect could be cured.

¶ 24　After revisiting the evidence presented at the prior hearing, the trial court reiterated its finding that the State proved, by clear and convincing evidence, that defendant committed the offense. The court noted that it was not making a finding "beyond a reasonable doubt.*** It's enough for the statute." The court again found that defendant was a danger to the community and that electronic monitoring would not be appropriate.

¶ 25　Regarding the State's unverified petition, the trial court found that "the defense went through a hearing on this, never raised that before, and then like whatever, a month later comes up [with] that suggestion. I believe the defense has forfeited or waived presenting that at this point ***." The court further determined that under Supreme Court Rule 137 (eff. Jan. 1, 2018), "the

State would be allowed to sign and verify that at this point without prejudicing the defendant's rights ***." The trial court ordered that defendant remain detained.

¶ 26    Defendant filed this appeal.

¶ 27                                II. ANALYSIS

¶ 28    Defendant first contends that we should vacate the trial court's order denying him pretrial release because the State's petition was "fatally defective." He contends that the State never signed the petition, and section 110-6.1(d)(1) requires that "[t]he petition shall be verified by the State." 725 ILCS 110-6.1(d)(1) (West 2024). Defendant argues that the trial court should have struck the State's petition and, as a result, the court would have no authority to deny him pretrial release.

¶ 29    Although the record on appeal did not contain a signed petition, the State filed a motion in this court to supplement the record with a petition allegedly signed by an assistant state's attorney on October 31, 2025, after the motion for relief hearing. The motion stated that it was made pursuant to Illinois Supreme Court Rule 329. Defendant filed a response objecting to the motion. The State's motion, and defendant's response, were taken with the case.

¶ 30    In general, "matters not properly part of the record and not considered by the court in the proceedings below will not be considered on review even if they are included in the record." *Garvy v. Seyfarth Shaw LLP*, 2012 IL App (1st) 110115, ¶ 26. However, Rule 329 provides a way for parties to supplement the record with documents that were before the trial court but not included in the record on appeal. The rule states that "[m]aterial omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court ***." Ill. S. Ct. R. 329 (eff. July 1, 2017).

¶ 31    Here, the record contains no stipulation by the parties or a trial court correction regarding the alleged error. Instead, defendant challenged the allegations in the State's motion. Rule 329

provides that "[a]ny controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth." *Id.* An evidentiary hearing before the trial court pursuant to Rule 329 would have been the proper procedure to supplement the record here. *People v. Allen*, 109 Ill. 2d 177, 185 (1985). Accordingly, we deny the State's motion to supplement the record with the signed petition and will address defendant's contention regarding the unsigned petition in the record.

¶ 32    The State argues that defendant has forfeited review of this issue. It is well-established that to preserve an issue for review, defendant must both object at trial and file a posttrial motion raising the alleged error. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). This principle encourages defendant to raise the issue before the trial court, thus allowing the court an opportunity to correct the error without wasting time and judicial resources. *People v. Jackson*, 2022 IL 127256, ¶ 15.

¶ 33    While defendant raised this issue below in his motion for relief, he did not make a contemporaneous objection during the proceedings despite several opportunities to do so. The State's petition was filed on June 13, 2025. At the July 3, 2025 hearing, the trial court acknowledged the parties' petitions and told defense counsel, "if you would like to expand on that or emphasize anything counsel for the defense, you are welcome to go ahead." Counsel did not mention the unverified petition. The matter was continued three times by agreement. At the hearing on September 29, 2025, the trial court asked the parties, "Is there anything you want to add on this?" Defense counsel again did not bring up the issue.

¶ 34    If defendant had made a timely objection, the prosecutor could have signed the petition at that time, thus curing the error. Supreme Court Rule 137(a) (eff. Jan. 1, 2018) allows for such a remedy. Instead, defendant raised the issue as error for the first time in his motion seeking relief filed pursuant to Rule 604(h)(2). Defendant cannot sit idly by and allow an irregular proceeding

to continue only to seek reversal due to the error if the outcome is unfavorable. *Id.* We find that defendant forfeited review of this issue. See *People v. Cooper*, 2025 IL 130946, ¶ 23 (finding that because the defendant failed to object to the timeliness of his pretrial detention hearing when the hearing was scheduled, he forfeited review of the timeliness issue).

¶ 35 Regardless of forfeiture, we find no basis for defendant's requested relief. Defendant's contention requires us to interpret a provision of the Code, which we review *de novo*. *People v. Robinson*, 217 Ill. 2d 43, 54 (2005). Our primary focus in construing a statute is to give effect to the legislature's intent. *People v. Grant*, 2022 IL 126824, ¶ 24. The best indicator of legislative intent is the language of the statute itself, given its plain and ordinary meaning. *Id.*

¶ 36 There is no question that the plain language of section 110-6.1(d)(1) imposes an obligation on the State to verify its petition to deny pretrial release. We are concerned, however, with the *consequences* of the State's failure to fulfill its obligation. Our supreme court "has consistently relied on the mandatory-directory distinction to determine the consequences of noncompliance with a statutory requirement." *People v. Cooper*, 2025 IL 130946, ¶ 29. A requirement is mandatory if the legislature intends a particular consequence for a failure to comply, and it is directory if no specific consequence is triggered. *Id.* ¶ 32. Significant here, the mandatory/directory designation identifies whether the failure to comply with a particular statutory requirement invalidates governmental action made pursuant to that provision. *Robinson*, 217 Ill. 2d at 51-52.

¶ 37 The law presumes that statutory language issuing a procedural command to a government official is directory, meaning that the failure to comply does not invalidate government action taken under that provision. *Cooper*, 2025 IL 130946, ¶ 33. This presumption is overcome "only if (1) negative language in the statute or rule prohibits further action in the case of noncompliance or (2) the right the statute or rule is designed to protect would generally be injured under a directory

reading." *People v. Geiler*, 2016 IL 119095, ¶ 18.

¶ 38 The first exception applies "when a statute expressly prescribes a consequence for failure to obey its command" or uses language indicating that "the command shall not be executed in any other manner or time ***." *Cooper*, 2025 IL 130946, ¶ 33. Here, section 110-6.1(d)(1) provides:

> "(1) The petition shall be verified by the State and shall state the grounds upon which it contends the defendant should be denied pretrial release, including the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts or flight risk, as appropriate." 725 ILCS 5/110-6.1(d)(1) (West 2024).

The plain language of this provision imposes no particular consequence if the State files an unverified petition. As such, the first exception does not apply here.

¶ 39 Regarding the second exception, courts must consider the statute's purpose as a whole. *Cooper*, 2025 IL 130946, ¶ 35. In *Cooper*, our supreme court conducted the mandatory/directory analysis in relation to the timely hearing requirement of section 110-6.1(c)(2) of the Code. After finding the first exception inapplicable, the court considered whether the failure to follow that procedure, in general, caused injury to the right the statute was designed to protect. *Id.*

¶ 40 The supreme court noted that the Pretrial Fairness Act aimed "to reform pretrial practices by eliminating cash bail and focusing on individualized assessments to ensure *both* public safety and fair outcomes, while ensuring that defendants are released pretrial unless there is clear and convincing evidence that they pose a risk of flight or a threat to others." (Emphasis in original.) *Id.* ¶ 37. The court emphasized that under the statute, both the defendant's rights and the community's rights are of significant concern. As a result, "courts *always* have the obligation to consider the danger that a defendant poses to others and the community when deciding whether pretrial release is appropriate." (Emphasis in original.) *Id.* ¶ 38. The court found that a strict

mandatory reading of the time requirement would not serve the statute's purpose where even a minor delay would result in the mandatory release of dangerous persons without regard to public safety. *Id.* ¶ 39.

¶ 41    The supreme court found that "reading section 110-6.1(c)(2) as directory properly balances the dual purposes of the statute ***." *Id.* The court held that since neither exception applied, the provision would be construed as directory with no specific consequence flowing from noncompliance. *Id.* ¶ 40. As a result, violation of the provision "does not result in automatic dismissal of the petition for pretrial detention." *Id.*

¶ 42    Similarly, if we read the verification requirement of section 110-6.1(d)(1) as mandatory, so that noncompliance would automatically invalidate an unsigned petition for detention, dangerous persons charged with detainable offenses could be released even where the State's failure to sign was readily apparent and the error could have been easily corrected. Such an outcome does not further the dual purposes of the statute.

¶ 43    Additionally, the State's failure to sign the petition does not, in general, injure defendant's protected right under the statute. Section 110-2 provides that "[a]ll persons charged with an offense shall be eligible for pretrial release before conviction," and pretrial release may be denied only after the trial court holds a hearing consistent with the provisions contained therein. 725 ILCS 5/110-2(a) (West 2024). The purpose of requiring verification of the petition is to ensure that the prosecutor has confidence in the petition's allegations and is not pursuing a frivolous or false claim. *People v. Haisley*, 2024 IL App (1st) 232163, ¶ 15. As this court noted in *Haisley*, even when a petition is unverified, "the prosecutor *** still has an ethical obligation not to submit a pleading without a basis in fact or that includes allegations known to be false." *Id.* If brought to the prosecutor's attention, he or she may very well sign the petition immediately. There is no reason

to believe that, because the State failed to sign the petition, defendant did not receive the hearing he was entitled to or that the hearing was held based on a petition containing baseless or false allegations. In fact, defendant makes no such claims here. We find the second exception to be inapplicable.

¶ 44 Since neither exception applies, the presumption for a directory reading regarding the statute's verification command remains. Accordingly, the mere failure to file a signed petition does not automatically invalidate the petition or the proceedings held thereon.

¶ 45 Defendant still may be entitled to relief if he can establish that he was prejudiced by the violation. *Cooper*, 2025 IL 130946, ¶ 41. However, he has not alleged that the lack of a signature on the State's petition prejudiced him. Since he does not dispute that he was subject to detention, and he does not contend that the State's noncompliance prejudiced him, he does not require a remedy for the violation. *Id.* ¶ 42. We emphasize that we in no way condone the State's failure to sign the petition. Verification ensures that the allegations made against an accused "are brought truthfully and in good faith." *People v. Collins*, 202 Ill. 2d 59, 67 (2002). We determine only that the relief requested by defendant is not appropriate in this case.

¶ 46 Alternatively, defendant contends that the State failed to show by clear and convincing evidence that he should remain detained pending trial.

¶ 47 Section 110-6.1(e) of the Code provides that "[a]ll defendants shall be presumed eligible for pretrial release." 725 ILCS 5/110-6.1(e) (West 2022). In order to detain defendant, the State must show, by clear and convincing evidence, that (1) the proof is evident or the presumption great that he has committed a detainable offense, (2) he poses a real and present threat to the safety of any person or the community based on the specific facts of the case, and (3) no conditions or combination of conditions exist that can mitigate this threat or defendant's willful flight. *Id.* Since

no live testimony was presented at the initial detention hearing, we review the trial court's fact findings, as well as the court's decision to detain defendant, *de novo*. *People v. Morgan*, 2025 IL 130626, ¶¶ 54-55.

¶ 48    Defendant first contends that the State failed to establish, by clear and convincing evidence, that he was the shooter. The State proffered that on May 22, 2021, just after midnight, Thornton and two passengers were traveling westbound on the I-290 expressway in a rented Nissan Altima. As the Nissan exited the highway onto the Austin ramp and then stopped in traffic, a red Ford Fusion pulled next to it. The Ford was registered to defendant. The driver of the Ford extended his arm out of the driver's side window and fired multiple shots into the Nissan's front passenger side, shattering the window. One passenger suffered an eye injury. Thornton, who was struck in the neck with a bullet, died. Police recovered a spent 40-caliber shell casing near Thornton's vehicle.

¶ 49    Surveillance video and evidence obtained from license plate readers showed that the Ford had been aggressively following the Nissan for some time prior to the shooting and then fled after the shooting. Defendant's cell phone data corroborated the path of the Ford and showed that it was at the scene when the shooting occurred. Defendant was also stopped by police in the Ford earlier that day for texting while driving. The Ford was located four days after the shooting at defendant's residence. After obtaining a search warrant for the vehicle, police recovered an expended 40-caliber shell casing in the glove box and another expended casing near the window wipers on the outside of the windshield. Testing showed that all three recovered shell cases were fired from the same weapon. Evidence also indicated that defendant had sent his grandfather incriminating text messages after the shooting.

¶ 50    Although no witness identified defendant as the shooter, strong circumstantial evidence supports that conclusion. Circumstantial evidence is admissible in criminal cases if it is relevant

and more probative than prejudicial. See *People v. Levy*, 204 Ill. App. 3d 201, 205 (1990). In fact, a criminal conviction may be based solely on circumstantial evidence. *People v. Brown*, 2013 IL 114196, ¶ 49. As such, a strong circumstantial proffer of what the evidence will show can certainly support the trial court's determination that the proof is evident, or the presumption is great, that defendant was the shooter in this case.

¶ 51    Defendant argues that the evidence supported his defense that someone else had his phone and used his vehicle during the shooting, and that there are innocent explanations for why he "would want to leave town." However, we find nothing in the statute to suggest that the State must disprove a potential defense to sustain its burden under the statute. Rather, the State need only present evidence "based upon reliable information." 725 ILCS 5/110-6.1(f)(2) (West 2024). While the clear and convincing standard requires proof greater than a preponderance, it does not quite approach the criminal standard of beyond a reasonable doubt. *In re D.T.*, 212 Ill. 2d 347, 362 (2004). More evidence may be required to prove defendant's guilt beyond a reasonable doubt, but that is not the standard here. We find that the State's evidence was sufficient to show that the proof is evident or the presumption great that defendant committed the offense.

¶ 52    Next, defendant contends that the State failed to establish that he posed a real and present threat to the safety of any person or the community. He argues that the State improperly relied on the inherent danger derived from the charges themselves to support its position. As a result, the State failed to make an individualized showing that defendant posed a danger to the public. He contends that his lack of criminal history, low PSA scores, and community ties demonstrated his lack of threat.

¶ 53    The nature and circumstances of the offense are relevant factors when considering defendant's dangerousness. See 725 ILCS 5/110-6.1(g)(1) (West 2024). Here, the State presented

evidence showing that defendant aggressively followed Thornton's Nissan on the highway before shooting Thornton as he was waiting to turn off the exit ramp. Although defendant had no history of violent conduct, the trial court noted that the shooting was a violent offense. Defendant fired a weapon multiple times at another vehicle while on a public road. Not only did the act of shooting pose a danger to the public, but the vehicles driven by defendant and his victim could have caused serious harm to others. We find that the State has met its burden on this element.

¶ 54    Defendant's final contention is that the State failed to establish that he would not comply with any conditions of release – electronic monitoring in particular. He also contends that the trial court's written order did not comply with section 110-6.1(h)(1). This section provides that in any detention order:

> "[t]he court shall *** make a written finding summarizing the court's reasons for concluding that the defendant should be denied pretrial release, including why less restrictive conditions would not avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case ***." 725 ILCS 5/110-6.1(h)(1) (West 2024).

¶ 55    In its oral ruling, the trial court found that electronic monitoring would not be appropriate because it "was geared towards supervising cases where the defendant is charged with a nonviolent offense. They don't have the capability to monitor someone like this where shots [were] fired from a car." The court also expressed concern that the shooting "was planned out." The trial court's written order merely stated that defendant would remain detained and did not elaborate on its findings. It is clear that the written order did not comply with section 110-6.1(h)(1).

¶ 56    However, the trial court did provide reasons for its ruling at the hearing, and the court's oral pronouncements were printed onto a transcript of the proceedings. If the trial court's oral

findings are reduced to writing in a transcript of proceedings, the reasoning contained therein should be considered along with the written order when determining whether the court complied with the requirement in section 110-6.1(h)(1). *People v. Vance*, 2024 IL App (1st) 232503, ¶ 29. These findings "may suffice, by itself, to satisfy the written-findings requirement as long as the oral findings are explicit and individualized, thus explaining to defendant the basis for detention and providing sufficient detail for meaningful appellate review." *Id.* We find the trial court's oral findings adequate here.

¶ 57    Defendant also questions the trial court's determination given the fact that it mistakenly recalled that defendant's DNA was found in the Ford, and that a female passenger was in the Ford with defendant. While the court may have misremembered certain facts, we find no indication in the record that it relied on those facts when resolving issues crucial to the case. See *People v. Williams*, 2013 IL App (1st) 111116, ¶¶ 85-86 (finding a due process violation where the trial court failed to recall crucial testimony from the only defense witness). Furthermore, our review is *de novo*. As a result, we need not defer to the trial court's judgment or its allegedly flawed reasoning. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 58    According to the State's proffer, defendant aggressively followed the victim's vehicle while both were travelling on a public highway. The victim was defendant's biological cousin. When the victim exited the highway, defendant followed. Defendant then pulled up next to the victim and shot him. Defendant has demonstrated a willingness to shoot a family member with two surviving witnesses present, and to do so without regard to the public's safety. We agree with the trial court that electronic home monitoring would not effectively mitigate this threat where it requires that defendant have two days of movement for basic activities per week, and such

monitoring is "reactive and permissive" in nature. *People v. Badie*, 2025 IL App (3d) 250033, ¶ 31.

¶ 59                                III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the circuit court's judgment that defendant remain detained pending trial.

¶ 61    Affirmed.